## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MICHAEL C. MILLER, SR. d/b/a,   )
MILLER'S LAWN SERVICE,   )
   )
      Plaintiff,   )
   )
v.   )   Civ. Action No. 12-216-SLR-CJB
   )
DELAWARE TECHNICAL &   )
COMMUNITY COLLEGE, LINFORD   )
P. FAUCETT, III, GEORGE E.   )
BOOTH, ROBERT W. HEARN, JR.,   )
KYLE L. SERMAN, and H. ALLAN   )
SCHIRMER, each individually and in their   )
official capacities,   )
   )
      Defendants.   )

## REPORT AND RECOMMENDATION

In this action filed pursuant to 42 U.S.C. §§ 1981 and 1983, Plaintiff Michael C. Miller,

Sr., d/b/a/ Miller's Lawn Service ("Plaintiff"), brought suit against Defendant Delaware

Technical & Community College ("DTCC") and Defendants Linford P. Faucett, III, George E.

Booth, Robert W. Hearn, Jr., Kyle L. Serman, and H. Allan Schirmer, in their individual and

official capacities (collectively, "Individual Defendants"). Presently pending before the Court is

Defendants' motion to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6)

("Motion"). (D.I. 4) For the reasons that follow, I recommend that the Motion be GRANTED-

IN-PART and DENIED-IN-PART.

## I.    BACKGROUND

### A.    The Parties

Plaintiff is a Delaware resident and the African-American and Native American Indian

1

owner of a landscaping business. (D.I. 1 at 2, at ¶ 5)  DTCC, established pursuant to Del. Code

tit. 14, § 9102, is an institution of higher education that operates on a few different locations in

Delaware, including the Jack F. Owens Campus ("Owens Campus") in Georgetown, Delaware.

(*Id.* at ¶ 6)  Defendant Faucett, a Caucasian male, served at all times relevant to the Complaint as

the Director of Administrative Services at the Owens Campus; he was a member of the five-

person DTCC panel ("five-person panel") assigned the task of scoring bidders to award the 2010-

2013 landscaping contract for the Owens Campus ("the 2010 Contract").  (*Id.* at ¶ 7)[1]  Defendant

Booth, a Caucasian male, served at all times relevant to the Complaint as the Assistant Director

of Administrative Services at the Owens Campus, and was a member of the five-person panel.

(*Id.* at 2-3, at ¶ 8)  Defendant Hearn, a Caucasian male, served at all times relevant to the

Complaint as the Campus Business Manager for the Owens Campus, and was a member of the

five-person panel.  (*Id.* at 3, at ¶ 9)  Defendant Serman, a Caucasian male, served at all times

relevant to the Complaint as the Chair of the Department of Applied Agriculture, was based at

the Owens Campus, and was a member of the five-person panel.  (*Id.* at ¶ 10)  Defendant

Schirmer, a Caucasian male, served at all times relevant to the Complaint as a maintenance

worker at the Owens Campus, and was a member of the five-person panel.  (*Id.* at ¶ 11)

### B.    Factual Background

In September 2006, Plaintiff submitted a bid for a landscaping contract with DTCC's

Owens Campus for the period of January 2007 through January 2010 (the "2007 Contract").  (*Id.*

---

[1]    Although Plaintiff's Complaint indicates that the five-person panel undertook the
task of awarding the "2007-2010 landscaping contract," this is a mistake, as the remainder of the
Complaint makes clear that the five-person panel was responsible for scoring bidders for the
2010-2013 contract, (*see* D.I. 1 at 8, at ¶¶ 33-46), and Plaintiff's brief confirms this, (D.I. 7 at 2).

at 4, at ¶¶ 13–14)  Six other companies, all of which were owned by Caucasians, also submitted bids.  (*Id.* at ¶ 14)  Plaintiff submitted the lowest of the qualified bids.  (*Id.*)  However, thereafter Defendant Faucett claimed that Plaintiff had failed to turn in a required Certified Pesticide Applicator License, and required the applicants to re-bid for the contract.  (*Id.* at ¶ 6)  Though Plaintiff contends that he did in fact submit the required license, he participated in the re-bid, along with nine other companies, all of which were owned by Caucasians.  (*Id.* at ¶¶ 7-8)  Again, Plaintiff's bid was the lowest, and he was ultimately awarded the 2007 Contract.  (*Id.* at ¶¶ 9-10)

However, despite notifying Plaintiff in November 2006 that he was the winning bidder, DTCC did not prepare the contract until January 2007, after Plaintiff's attorney had sent DTCC a letter asking when the contract would be ready.  (*Id.* at 4-5, at ¶¶ 10-11)  The prepared contract included a "permits and licensure" clause.  (*Id.* at 5, at ¶ 12)  DTCC employed Plaintiff under the contract from January 2007 until January 2010, when the contract expired.  (*Id.* at ¶ 13)  During this time, Plaintiff performed landscaping duties and ground maintenance for the Owens Campus, without incident or complaint about his performance.  (*Id.*)  In November 2008, Defendants recommended Plaintiff to Delaware State University ("DSU") for its grounds keeping needs.  (*Id.* at 8, at ¶ 31)  Defendants also implemented multiple recommendations that Plaintiff had made during his service to DTCC.  (*Id.* at ¶ 32)

Though the 2007 Contract was renewable for another two-year period at DTCC's option, DTCC chose not to renew the contract and to instead re-bid it.  (*Id.* at 5, at ¶¶ 14-15)  Accordingly, in September 2009, DTCC issued Requests for Proposals (the "RFP") for bid for the 2010 Contract.  (*Id.* at 5, at ¶ 15)  The RFP set forth specific causes that would result in the disqualification of a bidder and in rejection of the bid proposal, which included the bidder's

3

failure to provide certain required information listed in the RFP at the time of bid submission. (*Id.* at 5-6, at ¶¶ 16-17)  The RFP also set out the Safety Requirements and General Conditions to which the successful bidder must adhere, as well as the pertinent details regarding the work required to be done under the contract.  (*Id.* at 6, at ¶¶ 18-19)  In a change from DTCC's routine procedures for solicitation of bids, it requested that the submitted bids be sealed rather than open. (*Id.* at 7, at ¶ 22)

In March 2010, Plaintiff submitted his bid proposal of $68,868 per year.  (*Id.* at ¶ 23)  Of the seven bidders, Plaintiff's company was the only one owned and operated by a non-Caucasian. (*Id.* at ¶¶ 24-25)  DTCC interviewed three bidders, consisting of Plaintiff, Priority Services, LLC ("Priority") and Outdoor Design Group, LLC ("Outdoor").  (*Id.* at ¶ 24)  The bid proposals were reviewed and scored by the five-person panel (on a 100-point scale), based on five criteria listed in the RFP.  (*Id.* at 8, at ¶¶ 33, 36)  On April 12, 2010, Plaintiff was notified that the 2010 Contract had not been awarded to him, but instead was awarded to Outdoor, owned by Jeffrey Thompson, a Caucasian.  (*Id.* at 7, at ¶¶ 26-27)

Plaintiff asked to review the previously sealed bids and scoring.  (*Id.* at ¶ 28)  DTCC granted the request, and Plaintiff learned that Outdoor's bid was $65,750.00 per year, which was lower than Plaintiff's bid by just over $3,000.  (*Id.* at ¶¶ 28-29)  Plaintiff's bid was the second lowest, with all of the other companies' bids coming in at over $80,000 per year.  (*Id.* at ¶ 29) Plaintiff alleges that DTCC ultimately paid Outdoor not only more than the amount that Outdoor had bid, but more than even the amount of Plaintiff's bid.  (*Id.* at 7-8, at ¶ 30)

Plaintiff further alleges that, in reviewing the score sheets, he discovered a number of contradictions and inconsistencies in scoring.  (*Id.* at 8-11, at ¶¶ 33-46)  For example, Defendant

4

Schirmer gave Plaintiff and Priority the same score (a 45) for the "Price" category, even though Priority's bid was over $13,000 higher than Plaintiff's bid. (*Id.* at 7, at ¶¶ 23, 29; *id.* at 9, at ¶ 37) As another example, several Individual Defendants gave Outdoor and Priority higher scores than Plaintiff in the "Capacity to Meet Requirements" category despite the fact that Plaintiff had successfully met the requirements of the 2007 Contract. (*Id.* at 9, at ¶¶ 39-43) Plaintiff alleges that had the scoring been consistent across bidders, Plaintiff would have received a higher rating than Outdoor. (*Id.* at 11, at ¶ 46)

Moreover, Plaintiff alleges that the bidding information he reviewed showed that Outdoor failed to meet a number of requirements which should have resulted in it being disqualified from the bidding process. (*Id.* at 11–13, at ¶¶ 47-56) These issues included a problem with Outdoor's listed address and phone number, as well as its failure to provide appropriate certifications, proof of necessary insurance coverage, and licenses. (*Id.*) Outdoor was not disqualified for such deficiencies, and was awarded the contract in spite of them. (*Id.* at 13, at ¶ 56) Outdoor obtained and signed its contract within a week of being selected by Defendants (unlike Plaintiff, who had previously received a contract only after his lawyer issued a demand letter to DTCC). (*Id.* at ¶¶ 57–58) Outdoor's contract did not include the "permits and licensure" clause that Plaintiff's contract had contained. (*Id.* at ¶ 58)

## C.    Procedural Background

On February 22, 2012, Plaintiff filed a two-count Complaint against DTCC and the Individual Defendants. (D.I. 1) Plaintiff alleges that racial discrimination was the reason that his 2007 Contract with DTCC for landscaping services was not renewed, and the reason that Defendants selected a different landscaping company for the 2010 Contract. (*Id.* at 1, at ¶ 1; *id.*

at 3, at ¶ 12; *id.* at 14-16, at ¶¶ 67–83)  Plaintiff alleges that this conduct violated the Equal

Protection Clause of the Fourteenth Amendment[2] and asserts claims pursuant to 42 U.S.C. §§

1981 and 1983.  (*Id.* at 14-16, at ¶¶ 67-83)  Plaintiff seeks declaratory, monetary, and injunctive

relief for the alleged wrongdoing.  (*Id.* at 16–17)

On April 20, 2012, in lieu of answering, Defendants filed the instant Motion, pursuant to

Federal Rules of Civil Procedure 12(b)(1)[3] and 12(b)(6).  (D.I. 4)  On May 3, 2012, this case was

referred to the Court by Judge Sue L. Robinson to "conduct all proceedings, including alternative

dispute resolution; hear and determine all motions, through and including the pretrial

conference." (D.I. 6)  Defendants' motion was fully briefed as of May 14, 2012, (D.I. 8), and on

July 16, 2012, the Court heard oral argument regarding the motion.

## II.    STANDARD OF REVIEW

### A.    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of

subject matter jurisdiction.  "Under Rule 12(b)(1), the court's jurisdiction may be challenged

either facially (based on the legal sufficiency of the claim) or factually (based on the sufficiency

of jurisdictional fact)." *Kuhn Constr. Co. v. Diamond State Port Corp.*, Civ. No. 10-637-SLR,

2011 WL 1576691, at *2 (D. Del. Apr. 26, 2011).  Normally, once a challenge to subject matter

jurisdiction is made, the plaintiff bears the burden of establishing that it exists.  *Id.* (citing *Carpet*

---

[2]    Plaintiff's Complaint only refers generally to the Fourteenth Amendment, (D.I. 1 at 1-2, ¶¶ 2-3; *id.* at 16, at ¶ 83), but Plaintiff represented in his brief on this Motion that his claim is with respect to the Equal Protection Clause specifically, (D.I. 7 at 14-15).

[3]    With respect to the portions of the Motion that appear to be based upon Rule 12(b)(1), Defendants argue that the Eleventh Amendment of the U.S. Constitution bars claims against (1) DTCC and (2) the Individual Defendants in their official capacities.

*Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000)). "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000); *see also Kuhn*, 2011 WL 1576691, at *2. Dismissals on this basis are only proper "where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682-83 (1946); *see also Kuhn*, 2011 WL 1576691, at *2. On the other hand, "[i]n reviewing a factual challenge to the Court's subject matter jurisdiction, the Court is not confined to the allegations of the complaint, and the presumption of truthfulness does not attach to the allegations in the Complaint." *Shahin v. Delaware Dept. of Fin.*, Civ. No. 10-188-LPS, 2012 WL 1133730, at *3 (D. Del. Mar. 30, 2012) (citing *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "Instead, the Court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction." *Shahin*, 2012 WL 1133730, at *3 (citing *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997)); *see also Kuhn*, 2011 WL 1576691, at *3.

### B. Rule 12(b)(6)

The sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the Court separates the factual and legal

7

elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210–11. Second, the Court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 129 S.Ct 1937, 1950 (2009)). Thus, although a non-fraud claim need not be pled with particularity or specificity, that claim must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted).

Determining whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A plausible claim does more than merely allege entitlement to relief; it must also demonstrate the basis for that "entitlement with its facts." *Fowler*, 578 F.3d at 211 (citation omitted). Thus, a claimant's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *accord Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). In other words, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). In assessing the plausibility of a claim, the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210 (citing *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

8

## III.   DISCUSSION

Defendants argue that Plaintiff's Complaint fails to state a claim for the following reasons: (1) the Eleventh Amendment of the United States Constitution immunizes DTCC and the Individual Defendants in their official capacities from liability; (2) Plaintiff has failed to plead sufficient facts to identify a plausible claim for relief; and (3) the doctrine of qualified immunity applies to protect the Individual Defendants from liability. (D.I. 5)  The Court will address each of these arguments in turn.

### A.   Eleventh Amendment Immunity

Defendants' first argument is that Plaintiff's claims against DTCC and the Individual Defendants in their official capacity should be dismissed for lack of subject matter jurisdiction, because DTCC is an arm of the state that is entitled to sovereign immunity pursuant to the Eleventh Amendment (and the Individual Defendants are thus state officials who are also immunized from liability for official capacity claims).  (D.I. 5 at 6; D.I. 8 at 1-6)  Plaintiff disputes that DTCC is an arm of the state that is afforded the protection of Eleventh Amendment immunity.  (D.I. 7 at 5-9)  Therefore, the Court must "analyz[e] the relationship between [DTCC] and the State, to determine whether there is such an identity of interest between the two that the suit against [DTCC] is in fact one against the State."  *Hanshaw v. Delaware Technical & Cmty. Coll.*, 405 F. Supp. 292, 300 (D. Del. 1975).

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. "While the text of the Amendment does not specifically bar lawsuits

9

against a State by its own citizens, the 'ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal courts.'" *Paoli v. Delaware*, Civil Action No. 06-462 (GMS), 2007 WL 4437219, at \*2 (D. Del. Dec. 18, 2007) (quoting *Bd. of Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001)). It is well-settled that "Eleventh Amendment immunity extends to entities that are considered arms of the state." *Paoli*, 2007 WL 4437219, at \*4; *see also Regents of the Univ. of California v. Doe*, 519 U.S. 425, 429 (1997). In other words, where the state is essentially the "real party in interest," the Eleventh Amendment will operate to bar the suit even if the state is not named as a party to the action. *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989).

In *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989), the United States Court of Appeals for the Third Circuit adopted a three-factor test to determine whether "a suit against an entity is actually a suit against the state itself," thus implicating Eleventh Amendment immunity. *Fitchik*, 873 F.2d at 659. Those factors are: "(1) [w]hether the money that would pay the judgment would come from the state . . . (2) [t]he status of the agency under state law . . . ; and (3) [w]hat degree of autonomy the [entity] has." *Id.*; *see also Paoli*, 2007 WL 4437219, at \*4. All of the factors are to be considered equally, with none of them having predominant importance. *Kuhn*, 2011 WL 1576691, at \*4 (citing cases). The United States Supreme Court has instructed, however, that "in close cases, where 'indicators of immunity point in different directions,' [] the principal rationale behind the Eleventh Amendment—protection of the sovereignty of states through 'the prevention of federal-court judgments that must be paid out of a State's treasury,'[]— should 'remain [a court's] prime guide.'" *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 229–30 (3d Cir. 2006) (quoting *Hess v.*

*Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47–48, 52 (1994)).

The Third Circuit has recognized that an assertion of Eleventh Amendment immunity does not implicate subject matter jurisdiction in the ordinary sense. *Christy v. Pennsylvania Tpk. Comm'n*, 54 F.3d 1140, 1146 (3d Cir. 1995). In that regard, Eleventh Amendment immunity is treated as an affirmative defense, and the party asserting immunity must prove its existence. *Id.* With respect to factual questions that arise in that analysis, the party asserting Eleventh Amendment immunity bears the burden of production and persuasion. *Febres*, 445 F.3d at 229; *Christy*, 54 F.3d at 1146.

The question of whether DTCC is cloaked with Eleventh Amendment immunity has been presented to this Court in two cases prior to this one. In the first, *Hanshaw v. Delaware Technical & Cmty. Coll.*, 405 F. Supp. 292 (D. Del. 1975), DTCC moved to dismiss a civil rights lawsuit filed against it pursuant to the Eleventh Amendment. *Hanshaw*, 405 F. Supp. at 299-300. Treating the motion as a motion for summary judgment due to accompanying affidavits, this Court noted that on "the incomplete record" before it, there was "at the least, a substantial problem as to whether [DTCC] is a State agency independent of the State for Eleventh Amendment purposes." *Id.* at 295, 300-01. In light of the explicit powers that were enjoyed by DTCC's Board of Trustees, the *Hanshaw* Court concluded that "Del Tech is not an alter ego of the State," and further held that DTCC had not met its burden of proof regarding the issue of whether ultimate payment for any judgment would come from the State treasury. *Id.* at 300-01. Accordingly, the *Hanshaw* Court held that, on the record before it, the college "ha[d] not successfully invoked the Eleventh Amendment as a bar to the monetary damage relief requested by plaintiffs." *Id.* at 301.

11

In the second case, *Paoli v. Delaware*, Civil Action No. 06-462-GMS, 2007 WL

4437219, at *1 (D. Del. Dec. 18, 2007), DTCC had been sued along with the State of Delaware

by a plaintiff alleging violations of certain constitutional rights. The defendants filed a motion

for judgment on the pleadings, with DTCC arguing, *inter alia*, that the plaintiff's complaint

should be dismissed because it was entitled to sovereign immunity under the Eleventh

Amendment. *Id.* at *1, *4. However, DTCC did not address the *Fitchik* factors in its briefing,

prompting the *Paoli* Court to conclude that there was insufficient evidence in the record to make

a determination regarding immunity at that early, pre-discovery stage in the proceedings. *Id.* at

*4.[4]

While this Court has issued substantive rulings with respect to the immunity of other

Delaware in-state universities (the University of Delaware and Delaware State University), to

which the parties cite in support of their positions for or against a finding of immunity here,[5] this

Court, as well as the Third Circuit, has found consideration of such rulings to be of minimal

utility when conducting an Eleventh Amendment immunity analysis. Specifically, this Court has

---

[4]       Plaintiff's answering brief could be read to suggest that the *Paoli* Court issued a
substantive ruling with respect to the question of DTCC's immunity (and that it denied DTCC's
argument in this regard on the merits). (D.I. 7 at 7-8) To the extent that is Plaintiff's suggestion,
the Court does not find it to be a fair reading of *Paoli*. Rather, on the sparse record before it, the
*Paoli* Court merely was "unwilling to conclude *at [that] time*" that DTCC was entitled to
Eleventh Amendment immunity. *Paoli*, 2007 WL 4437219, at *4 (emphasis added).

[5]       (D.I. 7 at 8 n.9 (citing *Gordenstein v. Univ. of Del.*, 381 F. Supp. 718, 722 (D.
Del. 1974) and *McKay v. Delaware State Univ.*, No. Civ. A. 99-219-SLR, 2000 WL 1481018 (D.
Del. Sept. 29, 2000)) and D.I. 8 at 2 n.10 (citing *McKay* and *Carter v. Del. State Univ.*, No. Civ.
A. 99-642-GMS, 2002 WL 335309, at *7 (D. Del. Feb. 27, 2002))) In these cases, the Court
held, respectively, that the University of Delaware was not an arm of the State of Delaware for
purposes of the Eleventh Amendment analysis, while Delaware State University was protected by
Eleventh Amendment immunity.

found that "[a]nalogies to other institutions of higher learning are of limited value because 'each

state university exists in a unique governmental context, and each must be considered on the

basis of its own peculiar circumstances.'" *Eaton v. Univ. of Delaware*, No. C.A. 00–709–GMS,

2001 WL 863441, at \*3 n.6 (D. Del. July 31, 2001) (quoting *Kovats v. Rutgers*, 822 F.2d 1303,

1312 (3d Cir. 1987). For this reason, though the Court recognizes that there are some similarities

between DTCC and other Delaware in-state educational institutions, the Court will conduct an

independent analysis of DTCC's status pursuant to the factors set out in *Fitchik*.[6]

### 1.    Source of Money for a Judgment

The first *Fitchik* factor—whether the money that would pay the judgment would come

from the state— includes consideration of "whether payment will come from the state's treasury,

whether the [entity] has the money to satisfy the judgment, and whether the sovereign has

immunized itself from responsibility for the [entity's] debts." *Fitchik*, 873 F.2d at 659. "The

crux of this criterion is whether the state treasury is legally responsible for the payment of a

judgment against the entity." *Kuhn*, 2011 WL 1576691, at \*4 (citations omitted).

DTCC argues that this factor supports a finding of immunity for two reasons. First,

DTCC asserts that it "receives a large portion of its funding from the State." (D.I. 8 at 4) In

---

[6]     Plaintiff contends that Defendants failed to timely brief the *Fitchik* factors since
Defendants' opening brief did not address those factors. (D.I. 7 at 6-7) In response, Defendants
explain that because Plaintiff's Complaint averred that DTCC "is a *state agency* governed by a
Board of Trustees under 14 Del. C. § 9102," DTCC believed that Plaintiff had conceded that it is
an arm of the state and that a *Fitchik* analysis was therefore unnecessary. (D.I. 8 at 1 (citing D.I.
1 at 2, at ¶ 6) (emphasis added)) To the extent that Plaintiff believes that Defendants have
somehow waived their Eleventh Amendment immunity argument for failing to initially address
the *Fitchik* factors in their opening brief, the Court disagrees, as not only is Defendants'
explanation a logical one, but Defendants both (1) asserted immunity pursuant to the Eleventh
Amendment in their opening brief; and (2) specifically addressed the *Fitchik* factors in their reply
brief.

.

13

support, DTCC cites to Del. Code tit. 14, § 9108, which requires that the college give a bond "with good and sufficient security to the State in the sum of $10,000, conditioned for the faithful application of all the moneys received." (*Id.*) It also cites to an appropriations bill from the Delaware House of Representatives, indicating that over $67 million was allocated to DTCC in fiscal year 2012, which DTCC asserts was more than 50% of its annual budget. (*Id.*) Because DTCC also receives funding from other sources including tuition, fees, and sales, it argues that "it would be increasingly difficult to determine the source of the funds that would satisfy a judgment." (*Id.* at 5) Second, DTCC contends that it is unaware of any immunization that prevents the State from being responsible for DTCC's debts. (*Id.*)

For its part, Plaintiff argues that this factor weighs against immunity because the Delaware Code does not authorize payments to DTCC as it does to other state colleges (such as DSU). (D.I. 7 at 6) Instead, Plaintiff argues, the Code makes DTCC's Board of Trustees (the "Board") responsible for the institution, its management and control. (*Id.* (citing Del. Code tit. 14, § 9105(c)))

The first inquiry relevant to this factor is whether payment will come from the state's treasury. As DTCC itself has conceded, "[a]pplication of the first factor is far more complicated than one would expect." (D.I. 8 at 2) For example, the fact that DTCC receives a substantial sum of money from the State in a given fiscal year is not dispositive of the question of whether a judgment against DTCC would ultimately be paid by the State. *Febres*, 445 F.3d at 233 ("[T]he fact that New Jersey is the principal source of the Board's finances does not alone confer immunity, or even compel a finding that this prong of the analysis favors immunity."). The reason why such a fact is not afforded conclusive weight as to this factor is that "[t]he magnitude

14

of the State's voluntary contributions does not alter the fact that, once deposited into the entity's accounts, these funds belong to the entity. [] If subsequently used to pay a judgment, the judgment has been satisfied with the entity's monies, not the State's." *Kuhn*, 2011 WL 1576691, at *5; *see also Febres*, 445 F.3d at 233-34 (affording no legal consequence to the state's substantial funding of defendant entity, such that "non-state funds comprise a relatively small percent of the [defendant entity's] budget," where "[t]he record does not suggest that [the state] retains ownership or control of the funds appropriated to [the defendant]"). Here, though DTCC has cited to evidence regarding the State's issuance of money to it, there is no evidence to suggest that the State continues to exercise control over those funds once they are in DTCC's possession, and thus this factor weighs against a finding of immunity.

The second part of the state treasury inquiry is whether the entity has money to satisfy the judgment. *Kuhn*, 2011 WL 1576691, at *4. Neither of the parties explicitly addressed this issue in their briefing, and the lack of record evidence on the point put forth by DTCC redounds in Plaintiff's favor. *Christy*, 54 F.3d at 1146 (stating that "the [agency's] failure to provide pertinent information regarding its ability, or lack thereof, to satisfy a potential judgment against it simply means that the [agency] has failed to sustain its burden of proof on this important question").

As to the third part of the inquiry—whether the sovereign has immunized itself from responsibility for the agency's debts— while states can and do take affirmative steps to expressly shield themselves from such liability,[7] Delaware has apparently not done so with respect to

---

[7]     *See e.g.*, *Kuhn*, 2011 WL 1576691, at *4 ("[T]he State's potential legal liability for [the Diamond State Port Corporation's] debts has been disclaimed by statute. *See* 29 Del. C. § 8785 ('[T]he State shall not assume or be deemed to have assumed any debt or liability of

15

DTCC. (D.I. 8 at 5)  DTCC suggests that the lack of any statutory immunity should be read as

suggesting that the State is obligated, by default, to pay a judgment.  (*Id.*)  However, on this

point, Third Circuit case law counsels that the absence of a blanket disclaimer from liability is

not significant; what is significant is whether DTCC has established that the State is "under any

affirmative obligation to pay [DTCC's] unassumed liabilities in the first place." *Christy*, 54 F.3d

at 1147.  Here, DTCC has made no such showing.

On the record presently before the Court then, DTCC has failed to establish that:  (1)

payment for a judgment against DTCC will come from the State's treasury (as opposed to funds

controlled by DTCC itself); (2) DTCC lacks financial resources to satisfy any judgment; and (3)

Delaware would be under any obligation to satisfy any such judgment against DTCC.

Accordingly, the first, important, *Fitchik* factor weighs against a finding of immunity. *See id.* at

1147-48 (finding that where defendant entity failed to put forth sufficient evidence regarding

these inquiries, "the funding factor, the most important of the three, weighs heavily in support of

the conclusion that the [defendant entity] is *not* an arm of the Commonwealth of Pennsylvania

and does not enjoy Eleventh Amendment immunity").

### 2.    DTCC's Status under State Law

The second *Fitchik* factor involves a determination of the agency's status under state law.

This factor requires the Court to consider "how state law treats the agency generally, whether the

---

[defendant] as the result of any exercise of power by' defendant).  This absence of legal liability
provides a compelling indicator that the state treasury criterion . . . weighs against immunity.")
(internal quotation marks and citations omitted); *Cooper v. SEPTA*, 548 F.3d 296, 304 (3d Cir.
2008) (holding that Pennsylvania's disclaimer of liability for judgments against the debts of
SEPTA, as set out in 74 Pa. Cons. Stat. § 1741(c), was a key factor that weighed heavily against
a finding of immunity as to the state-treasury prong).

entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation." *Fitchik*, 873 F.2d at 659.

Plaintiff argues that DTCC, through its Board, has the power under State law to acquire, own, lease, use and operate property, to enter into contracts, and to accept money or property. (D.I. 7 at 6 (citing Del. Code tit. 14, §§ 9105(d)(10)-(12))) Plaintiff notes that these powers were deemed important in *Riley v. Delaware River and Bay Auth.*, 457 F. Supp. 2d 505 (D. Del. 2006), when analyzing *Fitchik*'s second prong, and that the Court should take them into account here as well. (D.I. 7 at 6-7)

In support of its contrary position that State law treats DTCC as a state agency, Defendants point to: (1) DTCC's enabling statute, which refers to DTCC as a "state agency," Del. Code tit. 14, § 9102; (2) DTCC's inclusion on Delaware's Departmental List of State Agencies; (3) the fact that DTCC's employees are considered State employees; and (4) the Superior Court of Delaware has issued opinions noting that DTCC's employees are State employees, that the college's land is State owned, and that the college falls within the State's Administrative Procedures Act.[8] (D.I. 8 at 5) Defendants assert that these facts distinguish this case from the facts at issue in *Riley*. (*Id.*)

In *Riley*, the Court considered whether the Delaware River and Bay Authority (the "DRBA"), an entity created by a compact between Delaware and New Jersey, was entitled to sovereign immunity. *Riley*, 457 F. Supp. 2d at 513-14. The Court found that there were a

___

[8]     The cases Defendants point to in this regard include *Garrett v. State*, No. 07A-04-004 (JTV), 2008 WL 4152743 (Del. Super. Ct. Aug. 29, 2008), which considers a worker's compensation benefits appeal, and *Sinha v. Bd. of Tr. of Del. Technical & Cmty. Coll.*, 585 A.2d 1310 (Del. Super. Ct. 1990), which considers a breach of contract claim filed against DTCC by a terminated employee.

17

number of facts that could support a finding in either party's favor as to *Fitchik*'s second prong. *Id.* Weighing these competing facts relating to DRBA's status, the Court concluded that "[o]n balance . . . the DRBA cannot be said to be the creature of either state. It arises from a compact between two sovereigns and is synonymous with neither." *Id.* at 514. The Court reads the holding in *Riley* as being ultimately dependent more upon the unique circumstances surrounding the DRBA's creation than upon any other particular right or restriction asserted by State law. That is, faced with factors that could support a finding for either side as to *Fitchik*'s second prong, the *Riley* Court was ultimately persuaded by the fact that neither of the two states involved in the DRBA's creation really intended for it to be "an arm" of one state or another.

However, *Riley* and other cases from this Court, such as *Kuhn Constr. Co. v. Diamond State Port Corp.*, Civ. No. 10-637-SLR, 2011 WL 1576691 (D. Del. Apr. 26, 2011), can be helpful guides in understanding what a court should consider when examining the first factor under *Fitchik*'s second prong: "how state law treats the agency generally." *Fitchik*, 873 F.2d at 659. These cases take into account facts including some cited by the parties here, including whether the entity: (1) is subject to the Delaware Administrative Procedures Act; (2) is listed as a state agency on Delaware's departmental list of state agencies; and (3) has its employees treated as state employees. *Kuhn*, 2011 WL 1576691, at *5. Some of these facts weigh in favor of immunity in this case, including DTCC's listing as a state agency on Delaware's departmental list of such agencies (D.I. 8 at 5 n.25), and the fact that state law appears to treat DTCC's employees as state employees (*id.* at 5 n.26), and refers to DTCC as a "state agency", Del. Code tit. 14, § 9102. At least one appears to weigh against immunity—as although DTCC asserts that case law suggests that "the College falls within the Administrative Procedures Act," the case it

18

cites in support of that proposition, *Sinha v. Bd. of Tr. of Del. Tech. & Cmty. Coll.*, 585 A.2d 1310 (Del. Super. Ct. 1990), appears to stand for the opposite proposition. *See Sinha*, 585 A.2d at 1311 (stating that "the number of agencies controlled by the Act has grown from nineteen to thirty-four" but "Del Tech is *not* included" on that list of agencies) (emphasis added); (D.I. 8 at 5 n.28).[9]

The Court next looks to the other three factors that are specifically called out for consideration as to *Fitchik*'s second prong. As to "whether the entity is separately incorporated," the parties do not address this issue in their briefing. With regard to "whether the [entity] can sue or be sued in its own right," it is clear that DTCC can independently sue and be sued, pursuant to State law, which weighs against a finding of immunity. Del. Code tit. 14, § 9105(d)(4). And as to whether DTCC "is immune from state taxation", the parties also fail to take up this point.

Ultimately, the factors for determining DTCC's status under state law do not all point clearly in one direction. However, of those that are before the Court with sufficiently clarity, they weigh slightly in favor of a finding of immunity as to the second *Fitchik* prong.

---

[9]      As for other factors cited by the parties, DTCC asserted that the opinion in *Garrett v. State*, No. 07A-04-004, 2008 WL 4152743 (Del. Super. Ct. Aug. 29, 2008) stands for the proposition that "the College's employees are State employees and the College's land is State owned." (D.I. 8 at 5 & n.27) The case does make reference to the fact that DTCC's parking lot was (at least at the time) "state owned," though it says nothing about the former question, as the employee in that case was employed by Delaware's Department of Children, Youth and their Families, not by DTCC. 2008 WL 4152743, at *1-3. For its part, Plaintiff, as noted above, cites to a number of factors considered in *Riley* as to *Fitchik*'s second prong. These include DTCC's statutory authority to purchase and lease property, enter into contracts, and borrow money without the State's approval. (D.I. 7 at 6-7) However, as these facts tend to relate to the issue of DTCC's autonomy, the Court finds that they are best considered as to *Fitchik*'s third prong, which speaks directly to that issue, in order to avoid double-counting. In *Kuhn*, this Court took these factors into account as to *Fitchik*'s third prong, 2011 WL 1576691, at *6, and the Court will do so here as well.

19

### 3.   DTCC's Autonomy

The third and final *Fitchik* factor requires the Court to determine what degree of autonomy the agency has. *Fitchik*, 873 F.2d at 659. Defendants argue that DTCC lacks autonomy because the Board is appointed by the Governor, and because the General Assembly has created certain obligations by statute that DTCC must honor (in that, for example, it requires the college to give aid to needy students and establishes a pay-scale offered to employees). (D.I. 8 at 5-6 (citing Del. Code tit. 14, §§ 9103, 9109, 9219))

Here, the Court again finds instructive this Court's observations in *Kuhn*, where the parties made similar arguments regarding whether defendant Diamond State Port Corporation ("DSPC") was autonomous from the State of Delaware. The *Kuhn* Court pointed to a number of factors suggesting the defendant's autonomy from the State, including its ability to freely adopt its own by-laws, engage personnel, enter into contracts in its own name, borrow funds in its own name and purchase and develop property. 2011 WL 1576691, at *6. Defendant DSPC, on the other hand, had argued that several facts supported the conclusion that it lacked autonomy, including that it was solely owned by the Delaware Department of State, that its board of directors was controlled both in composition and method of appointment by the State, and that approval of the General Assembly was required to amend its certificate of incorporation, effect a merger or dissolution or sale of assets. *Id.* The *Kuhn* Court concluded that, while the defendant could not be called "highly autonomous," the State did not exercise the level of control over it necessary for immunity. *Id.*

By way of comparison, the *Kuhn* Court cited *Fitchik* and *Febres v. Camden Bd. of Educ.*, 455 F.3d 229 (3d Cir. 2006), two cases where, as here, there was significant gubernatorial control

20

over the entity's board of directors, but the entity at issue also exercised significant autonomy in its day-to-day operations. *See Fitchik*, 873 F.2d at 663-64; *Febres*, 445 F.3d at 231. The *Kuhn* Court noted that in both cases, the Third Circuit had found the Governor's veto power over the respective boards' actions to be important to its conclusion that this factor counseled slightly in favor of according immunity. 2011 WL 1576691, at *6 (citing *Fitchik*, 873 F.2d at 664 and *Febres*, 445 F.3d at 231). Finding that the circumstances of the case before it, where DSPC was not subject to such restrictions, were "notably distinguishable from those in which entities have been accorded immunity," the *Kuhn* Court held that the third factor weighed against a finding of immunity. 2011 WL 1576691, at *6.

The Court finds the *Kuhn* Court's analysis of the third *Fitchik* factor particularly helpful here. It is true that the composition of DTCC's Board is controlled by the Governor, but that fact, while not insignificant, has been found to weigh "only slightly in favor of immunity" by the Third Circuit. *Febres*, 445 F.3d at 231 (internal quotation marks and citation omitted). And State law does provide certain broad financial constraints under which DTCC must function. On the other hand, as Plaintiff points out, DTCC has the ability to act independently in many ways—for example, to contract, buy and sell land, to borrow money in its own name, to hire employees and fix their salaries and terms of employment, to make its own rules and regulations—without threat of veto by the Governor or without the need to seek prior approval of the legislature. Del. Code tit. 14, § 9105. The ability to freely exercise such powers is significant in the autonomy analysis. *Kuhn*, 2011 WL 1576691, at *6; *see also Kovats v. Rutgers, The State Univ.*, 822 F.2d 1303, 1311 (3d Cir. 1987) (concluding that Rutgers University was "largely autonomous," where although certain members of its governing bodies

21

were appointed by the governor, in running the university, those members were given a "high degree of self government", even where state law required the members to direct expenditures in accordance with certain financial and spending constraints) (internal quotation marks and citation omitted) (cited in *Kuhn*, 2011 WL 1576691, at *6).

Ultimately, in light of the facts discussed above, and the reasoning set out in *Kuhn* and the Third Circuit cases cited therein, the Court finds that the third *Fitchik* factor weighs slightly against a finding of immunity.

### 4.    Weighing of *Fitchik* Factors

Having considered each of the three *Fitchik* factors, the Court concludes that at this stage of the litigation, there is insufficient evidence in the record for a finding that DTCC is entitled to immunity pursuant to the Eleventh Amendment.  While the second factor, DTCC's status under State law, weighs slightly in favor of immunity, the remaining two factors, the source of the money for a judgment and the entity's autonomy, weigh against a finding of immunity (the latter slightly so).  The Court therefore finds that, at this time, DTCC has not met its burden of establishing that it is entitled to Eleventh Amendment immunity, or relatedly, that the Individual Defendants are immunized from claims brought against them in their official capacities.[10]

### B.    Alleged Pleading Deficiencies

Defendants' next argument is that Plaintiff's claims should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim.  Defendants assert that all of Plaintiff's claims fail to meet the pleading standards of Rule 8(a), as that rule is interpreted by *Twombly* and *Iqbal.*

---

[10]      Accordingly, it is unnecessary for the Court to consider at this time the questions of whether such immunity has been waived, or whether the Complaint seeks relief in violation of that immunity (i.e., relief other than prospective injunctive relief).

### 1.     Section 1981 Claims

Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have
> the same right in every State and Territory to make and enforce
> contracts, to sue, be parties, give evidence, and to the full and equal
> benefit of all laws and proceedings for the security of persons and
> property as is enjoyed by white citizens, and shall be subject to like
> punishment, pains, penalties, taxes, licenses, and exactions of
> every kind, and to no other.

42 U.S.C. § 1981.

"To state a claim under section § 1981, a plaintiff 'must allege facts in support of the

following elements: (1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate

on the basis of race by the defendant; and (3) discrimination concerning one or more of the

activities enumerated in the statute[,] which includes the right to make and enforce contracts . . .

.'" *Watson v. Dep't of Servs. for Children, Youths and Their Families Delaware,* Civ. Nos. 10-

978-LPS, 12-019-LPS, 2012 WL 2072867, at *4 (D. Del. June 8, 2012) (quoting *Brown v.*

*Phillip Morris, Inc.,* 250 F.3d 789, 797 (3d Cir. 2001)).[11]  Importantly, "[t]he statute is not

---

[11]     At the evidentiary stage of a case such as this, the framework to be applied for the
purpose of establishing intent to discriminate will vary depending on the type of claim. Such
frameworks, however, are not relevant at the pleading stage, at which Plaintiff "need not
establish his prima facie case to survive a motion to dismiss." *Jackson v. Rohm & Haas Co.,*
Civil Action No. 06-3682, 2007 WL 2668001, at *9 (E.D. Pa. Sept. 5, 2007), *vacated and
modified in part on other grounds,* 2007 WL 2702797 (E.D. Pa. Sept. 12, 2007), (citing
*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510-12 (2002)); *see also Farmer v. Aramark Corp.,*
Civil Action No. 11-5621, 2012 WL 346688, at *3 (E.D. Pa. Feb. 3, 2012). Instead, Plaintiff
need only "give respondent fair notice of what petitioner's claims are and the grounds upon
which they rest." *Swierkiewicz,* 534 U.S. at 514. However, in keeping with the standard the
Supreme Court has set forth in *Twombly,* "the complaint's 'factual allegations must be enough to
raise a right to relief above the speculative level.'" *Jackson,* 2007 WL 2668001, at *9 (citations
omitted); *see also Allstate Transp. Co. v. Se. Pennsylvania Transp. Auth.,* No. 971482, 1997 WL
666178, at *6 (E.D. Pa. Oct. 20, 1997) (in analyzing Section 1981 claim regarding public bidding
context at motion to dismiss stage, ultimately considering simply whether plaintiff had put

23

intended to 'include practices that were neutral on their face, and even neutral in terms of intent.'" *Evans v. Chichester Sch. Dist.*, 533 F. Supp. 2d 523, 537 (E.D. Pa. 2008) (quoting *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 388 (1982)). Thus, for Section 1981 to be violated, there must be "'purposeful discrimination,'" and "the impact of the action must be traced to 'a discriminatory purpose.'" *Evans*, 533 F. Supp. 2d at 537 (quoting *Gen. Bldg. Contractors*, 458 U.S. at 390).

Though the Complaint is less than clear regarding Plaintiff's precise claims, Plaintiff has asserted in his brief and at oral argument that he intends to assert two claims under 42 U.S.C. § 1981: a claim for non-renewal of the first contract, and a claim for rejection of the second contract. (D.I. 7 at 12-13) The Court will consider each claim separately.

### a. Section 1981 Claim for Non-Renewal of a Contract

Plaintiff's allegations regarding the circumstances surrounding DTCC's decision not to renew the 2007 Contract are sparse. Reading the Complaint in the light most favorable to Plaintiff, the Court can only discern three allegations that contain facts relating to the renewal decision. They are: (1) that Plaintiff performed the 2007 Contract without incident or problem; (2) that the 2007 Contract was renewable at DTCC's option for a period of two years on the same terms; and (3) that on September 28, 2009, Plaintiff received notice that DTCC would issue a request for proposals "instead of renewing the [2007] [C]ontract[,] as it was in the best interest of [DTCC]." (D.I. 1 at 5, at ¶¶ 13–15) The Complaint also states that Plaintiff is an African-American and a Native American Indian, and that the Individual Defendants are Caucasian.

---

forward "sufficient factual pleadings to make, at least, a tenuous inference that the awarding of the bid was indeed motivated by racial concerns" and finding that plaintiff had done so).

24

(*Id.* at 2-3, at ¶¶ 5, 7-11)  On these facts, Plaintiff alleges that "[t]he sole reason Defendants non-renewed [sic] Plaintiff's original contract . . . was Plaintiff's race." (*Id.* at 15, at ¶ 73)

   In their Motion, Defendants argue that Plaintiff has failed to adequately state a claim for non-renewal because he has not set forth any facts from which an intent to discriminate could fairly be inferred. (D.I. 5 at 9)  Instead, Defendants argue, Plaintiff makes only conclusory allegations regarding intent that are based on nothing more than the racial composition of the individuals involved. (*Id.*)  The Court agrees.

   To sufficiently state a violation of Section 1981, "[a] specific factual basis must be pled to create the inference of discrimination." *Frederick v. Se. Pennsylvania Transp. Auth.*, 892 F. Supp. 122, 125 (E.D. Pa. 1995) (citation omitted).  Accordingly, in order to establish intent to discriminate under the statute, "[c]onclusory allegations of generalized racial bias" are insufficient. *Flagg v. Control Data*, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992).  Put another way, "a plaintiff must do more than allege a series of unfortunate events and baldly allege that the defendants discriminated against him." *Abdullah v. Small Bus. Banking Dep't of the Bank of America*, Civil Action No. 13-305, 2013 WL 1389755, at *2 (E.D. Pa. Apr. 5, 2013) (citing *Gross v. R.T. Reynolds, Inc.*, 487 F. App'x 711, 2012 WL 2673139, at *3 (3d Cir. July 6, 2012)). "Instead, at bottom, a complaint must allege some facts to support the conclusion that the defendant[']s acts were motivated by an intent to discriminate against the plaintiff because of his race." *Abdullah*, 2013 WL 1389755, at *2 (citations omitted).

   Here, Plaintiff has only set forth "conclusory allegations of generalized racial bias" to support his claim that the decision not to renew the 2007 Contract was due to racial discrimination.  The allegations regarding DTCC's decision not to renew the 2007 Contract

25

demonstrate only that DTCC exercised its contractual right to re-bid the work that was the subject of that contract, instead of renewing the contract with Plaintiff.  Plaintiff does not dispute that DTCC had this right under the 2007 Contract.  Plaintiff does not allege any comparator evidence, such as facts regarding how other white employees were treated with regard to similar contract renewals, nor anything at all from which it could be inferred that DTCC typically renews such contracts and that its failure to do so here was plausibly the product of racial bias.  Nor does he allege any facts regarding incidents occurring during his employment that might plausibly suggest a wrongful motive for DTCC's decision not to renew the contract.  In fact, far from alleging facts that would suggest an improper motive in choosing not to renew, Plaintiff simply avers that DTCC's notice of non-renewal stated that the decision was "in the best interest of Defendant."  (D.I. 1 at ¶ 15)

Plaintiff's allegations concerning DTCC's decision not to renew the 2007 Contract are thus clearly conclusory, as there are no factual allegations from which the Court could infer that the decision, even assuming it was somehow improper, was motivated by Plaintiff's race. Indeed, as noted above, there are barely any factual allegations at all in the Complaint regarding the non-renewal decision itself (i.e., as to who made the decision, the process leading to that decision, or how and why the decision was made).  In such a circumstance, the claim cannot withstand a Rule 12(b)(6) motion. *See Gross*, 487 F. App'x at 716-17 & n.9 (dismissing plaintiff's claim where the complaint "allege[d] an abundance of wrongdoing by [defendant] and its employees" but "fail[ed] to allege any facts supporting the conclusion that those acts were motivated by discrimination on the basis of race" by, *inter alia*, "fail[ing] to allege how [defendant] treated non-minority contractors any differently than it treated him" or "fail[ing] to

allege any facts suggesting that [defendant] exercised [authority expressly granted by a contract] for discriminatory reasons"); *Shipley v. Orndoff*, 491 F. Supp. 2d 498, 506 (D. Del. 2007) (dismissing plaintiff's Section 1981 claim where plaintiff "fail[ed] to allege any facts whatsoever that would substantiate his broad allegations of racial discrimination and has only alleged a conclusion without presenting any facts to support it").

Accordingly, the Court recommends that this Court dismiss Plaintiff's Section 1981 claim, to the extent it is based on DTCC's decision not to renew the 2007 Contract.

### b.     Section 1981 Claim for Rejection of a Contract in a Public Bidding Context

As compared with his non-renewal claim, Plaintiff's Section 1981 claim for rejection of a contract is supported by substantially more facts. Though Defendants argue Plaintiff's claim should be dismissed for failure to adequately plead intent to discriminate, (D.I. 5 at 9; D.I. 8 at 9), the Court finds that Plaintiff has included sufficient facts in support of this claim to push it over the line of plausibility.

Having disregarded the Complaint's legal conclusions in accordance with the instructions of *Twombly* and *Iqbal*, the Court considers the factual allegations that remain: (1) Plaintiff was the only minority among all bidders (both in 2007 and 2010), and there were no minorities on the selection panel (all of whom were Caucasian); (2) Plaintiff was required to meet specific requirements to secure the 2007 Contract, even after establishing himself as the winning bidder; (3) Defendants had no complaints about Plaintiff's work during the time he was employed with DTCC, but chose not to renew his contract; (4) the bidding process for the 2010 Contract was subjective and inconsistent; (5) the winning bidder was Caucasian; (6) the winning bidder did not meet certain requirements that, pursuant to DTCC's own rules, must be satisfied; (7) certain

27

requirements previously enforced against Plaintiff as part of the 2007 Contract process were not enforced against the winning bidder in the 2010 Contract process; (8) had the rules been enforced and the winning bidder disqualified, then Plaintiff, as the second lowest bidder, would have won the contract; and (9) DTCC's justification for awarding the contract to someone other than Plaintiff—that the winner outbid him—is a pretext, as DTCC ultimately paid the winning bidder more than the amount of Plaintiff's bid. (D.I. 1 at ¶¶ 5-58)  Taken as true, and when considered together, these allegations make it at least plausible that Plaintiff was not awarded the 2010 Contract because of his race.

Courts in this Circuit have allowed cases to go forward on similar allegations. For instance, in *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572 (D. Del. 2007), defendants moved to dismiss minority plaintiffs' Section 1981 claim, which was based on plaintiffs' allegations that "[s]imilarly situated whites were not required [by defendants] to meet all the requirements imposed upon the [p]laintiffs to be eligible for a mortgage." *Id.* at 580 (alterations in original). This Court denied defendants' motion, finding that the allegations—specifically that plaintiffs were minority home buyers seeking mortgages for houses in a white neighborhood, that plaintiffs had previously successfully obtained mortgages from defendants for houses in minority neighborhoods, and that plaintiffs were required by defendants to meet different requirements than were similarly situated whites—were sufficient "to draw a reasonable inference of intentional racial discrimination" for purposes of the "intent to discriminate" element of a Section 1981 claim. *Id.* at 580-81.  Here, Plaintiff makes similar factual allegations to those of the home buyers in *Anderson*, including that he was the only minority applying for a position before an entirely white panel of decision-makers and that he was treated differently than were

28

similarly situated white applicants.

Similarly, in *Farmer v. Aramark Corp.*, Civil Action No. 11-5621, 2012 WL 346688 (E.D. Pa. Feb. 3, 2012), the plaintiff asserted a Section 1981 claim, in which he alleged, *inter alia*, that his former employer discriminated against him on the basis of race by not posting vacant employment positions, thereby denying plaintiff the opportunity to apply for the positions, and by firing him. *Id.* at *1. The defendant moved to dismiss on the grounds that the plaintiff's allegations were conclusory and that he failed to allege any concrete facts giving rise to an inference of unlawful discrimination. *Id.* at *3. As the *Farmer* Court described it, the defendant's primary complaint was that the plaintiff's claim was inadequate because it was based "on mere speculation and bald assertions about the motives behind [defendant Aramark's] decisions not to post certain positions and to terminate [plaintiff's] employment." *Id.* But, as the *Farmer* Court pointed out, the plaintiff's burden at the pleading stage is not high. Rather, "to state a claim, a plaintiff must state enough factual matter, taken as true, to suggest the required element, which does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* Considering the standard that plaintiff needed to meet, the Court held the allegations in the complaint were sufficient:

> Aramark asserts that Farmer has not alleged any concrete facts that
> would give rise to an inference of unlawful discrimination.
> However, regarding the Concessions Manager position that was
> not posted by Aramark, Farmer avers in his Complaint that
> Aramark refused to post the vacant Concessions Director position,
> and instead, created a new position, Concessions Manager, and
> "selected Jeremy Campbell, a White male, to fill the position." In
> addition, Farmer identified Kevin Tedesco, a White male, as
> having been promoted to the Director of the Lincoln Financial
> Field position that Aramark failed to post. Moreover, with respect

29

> to Aramark's argument that Farmer failed to plead the identity of
> the Aramark decision-makers, we agree with Farmer that this issue
> can be developed in discovery. Thus, viewing all reasonable
> inferences in the light most favorable to Farmer, we deny
> Aramark's Motion to Dismiss with respect to Farmer's race
> discrimination claim.

*Id.* at *4 (internal citations omitted). The facts of *Farmer* also provide helpful context for what

types of pleading will be sufficient, and argue in favor of a finding that Plaintiff's allegations

here meet that threshold.

But because the line between "possible" and "plausible" is a thin one, it is also a useful

exercise to consider factually similar cases in which pleadings have been found insufficient. For

example, in *Golod v. Bank of Am. Corp.*, 403 F. App'x. 699 (3d Cir. 2010), the Third Circuit

affirmed the district court's dismissal of plaintiff's Section 1981 claim. The district court

dismissed the claim because the plaintiff had "failed to allege that nonmembers of the protected

class were treated more favorably[,]" and did not "detail what protected conduct she engaged in,

what promotions she was denied, or which Bank of America employee . . . denied her

promotion." *Id.* at 701. The Third Circuit agreed with the district court's analysis, noting that

the plaintiff had the burden of pleading enough facts to permit the inference that the adverse

employment action at issue occurred because of her race, sex, or national origin. *Id.* at 702. The

Third Circuit found that the plaintiff had not met this burden, because she offered "no factual

allegations to bolster her legal conclusions." *Id.* The Court went on to describe the type of

allegations that the complaint lacked:

> [S]he did not provide any characteristics of those individuals who
> received the promotions to which she alleges she was entitled. She
> did not provide any factual allegations regarding those promotions,
> who rejected her promotion requests and whether she was, in fact,
> qualified to fill those positions. Instead, she conclusorily asserted

30

> that she was denied promotions and educational opportunities. The
> District Court could not, nor can we, infer from these allegations
> that the denial of these requests and opportunities was because of
> her Russian and/or Jewish heritage.

*Id.*[12]

In *Wilkins v. Bozzuto & Assocs., Inc.*, Civil No. 09-2581, 2009 WL 4756381 (E.D. Pa

Dec. 10, 2009), the United States District Court for the Eastern District of Pennsylvania

dismissed a complaint alleging racial discrimination for similar reasons. There, the *Wilkins*

Court was reviewing an allegation of race discrimination premised on the charge that plaintiff's

white supervisor had terminated him and hired a non-minority replacement. *Id.* at *1-2. The

*Wilkins* Court held that the information presented in the complaint created "no more than a 'mere

possibility' of Plaintiff's right to relief[,]" in that it "does not record one incident in which

employees of other races were treated differently, [n]or an occasion in which his new supervisor

expressed or displayed racial bias", and it lacked "any explanation of the circumstances that led

him to believe that racial discrimination was involved in Defendant's hiring and firing

decisions." *Id.* at *2. Instead, the plaintiff "simply state[d], in conclusory fashion, that his firing

---

[12]    The *Golod* Court explained that allegations regarding similarly situated
individuals is only one of several ways a plaintiff could raise an inference of discrimination:

> Like the District Court, we focus on the absence of adequate comparator
> evidence because this appears to be the most obvious way to supplement
> Golod's deficient complaint. But Golod was not required to plead
> comparator evidence to support an inference of discrimination. Such an
> inference could be supported in a number of ways, including, but not
> limited to, comparator evidence, evidence of similar racial discrimination
> of other employees, or direct evidence of discrimination from statements
> or actions by her supervisors suggesting racial animus.

*Id.* at 703 n.2.

was related to his race, based upon the race of his supervisor, his lack of knowledge of complaints filed regarding his work . . . , and the unverified race of the employee who was subsequently hired to replace him." *Id.* Accordingly, the *Wilkins* Court dismissed plaintiff's complaint. *Id.* at *3.

Plaintiff's Complaint in the instant matter falls more in line with cases like *Anderson* and *Farmer*, in which motions to dismiss were denied, than with cases like *Golod* and *Wilkins*, where such motions were granted. Here, Plaintiff included the type of comparator evidence that was missing from both of the latter cases. Specifically, he included factual allegations regarding the identities and racial composition of the other bidders, including the winning bidder, Outdoor. He included specific allegations regarding his qualifications for the job and specific allegations regarding the winning bidder's lack of qualification. He asserted instances in which the selection criteria for the position were assertedly exercised in a contradictory and inconsistent fashion. Finally, he included an account of the ways in which Outdoor was treated differently when it was the winning bidder than was Plaintiff after Plaintiff won the 2007 Contract. Taken together, these facts at least create a plausible inference of discrimination, which is all that Plaintiff must do to survive the instant Motion. *Cf. Depelligrin v. A & L Motor Sales, LLC*, Civil Action No. 2:11-cv-01579, 2012 WL 3073182, at *5 (W.D. Pa. July 27, 2012) (finding, as to ADEA claim, that allegations regarding the "large disparity between [the ages of plaintiff and the person who was hired to replace him], along with the [plaintiff's] claims that he was an exemplary employee and that [his replacement] lacked the necessary qualifications for the driver position" were sufficient to "make[] it at least plausible that [plaintiff] was terminated because of his age") (internal quotation marks and citation omitted).

32

For all of these reasons, the Court recommends that Defendants' Motion be denied with respect to Plaintiff's Section 1981 claim for rejection of a contract.

## 2. Section 1983 Claims

Section 1983 provides, in relevant part: "Every person who, under color [of law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. Section 1983 does not create substantive rights, but instead "merely provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." *Estate of Smith v. Marasco*, 318 F.3d 497, 505 (3d Cir. 2003). "To state a claim under [Section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."[13] *West v. Atkins*, 487 U.S. 42, 48 (1988). "Under Third Circuit precedent, a [Section] 1983 claim will survive a motion to dismiss under Rule 12(b)(6) if it 'allege[s] the specific conduct violating the plaintiff's rights, the time and place of the conduct, and the identity of the responsible officials.'" *Knight v. Carmike Cinemas*, Civil Action No. 11-280, 2011 WL 3665379, at *4 (D. Del. Aug. 22, 2011) (quoting *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 666 (3d Cir. 1988)). Here, Plaintiff's claims are based on alleged violations of the Equal

---

[13]     Plaintiff alleges, and Defendants do not here dispute, that Defendants' actions were under color of State law. (D.I. 1 at 16, at ¶ 82) The Court will thus assume this requirement is met for purposes of resolving the instant Motion. *See Lamb v. Taylor*, C.A. No. 08-324 GMS, 2009 WL 866793, at *3 n.1 (D. Del. Mar. 31, 2009) ("[A]n entity that is not an arm of the state . . . can be a state actor for purposes of [Section] 1983.").

33

Protection Clause of the Fourteenth Amendment. (*See* D.I. 7 at 14-15)[14]

The Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "This is essentially a direction that all persons similarly situated should be treated alike." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005) (citation omitted). To bring a claim for the denial of equal protection, a plaintiff must demonstrate that he "received different treatment from that received by other individuals similarly situated." *Id.* (citation omitted). Ultimately, "plaintiffs must prove the existence of purposeful discrimination." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990). Relatedly, in considering whether a plaintiff has adequately pled a claim for denial of equal protection, a court must determine whether, as a threshold matter, the complaint alleges facts supporting the conclusion that: "(1) the complaining person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights,

---

[14]     Defendants contend that Plaintiff's Complaint fails to explain the relevance of the Fourteenth Amendment, including which type of claim was being asserted (i.e., Equal Protection or Due Process). (D.I. 5 at 2, 10) Without citation to any supporting legal authority, Defendants appear to argue that, for these reasons alone, Plaintiff's claims premised upon the Fourteenth Amendment must be dismissed. (*Id.*) However, because the Court is instructed to "construe the complaint in the light most favorable to [] [P]laintiff," *Fowler*, 578 F.3d at 210, and because the Complaint does assert violations of the Fourteenth Amendment and does contend that Plaintiff was treated differently than others—the crux of an Equal Protection claim—the Court is unpersuaded by this argument. *Cf. Metzgar v. Lehigh Valley Hous. Auth.*, No. Civ. A. 98-CV-3304, 1999 WL 562756, at *2 (E.D. Pa. July 27, 1999) (where plaintiff had generally alleged a cause of action under Section 1983, stating that "[r]eading the [] Complaint in the light most favorable to Plaintiff, the Court will construe the allegations in Count Three as a claim that Defendants, while acting under color of state law, deprived Plaintiff of her rights under the Due Process Clause of the Fourteenth Amendment").

or by a malicious or bad faith intent to injure the person." *Hennis v. Tedrow*, Civil Action No. 10-445, 2011 WL 6780692, at *3 (W.D. Pa. Dec. 27, 2011) (citing *Sabatini v. Reinstein*, No. Civ. A. 99–2393, 1999 WL 636667, at *2 (E.D. Pa. Aug. 20, 1999)).

Plaintiff's counsel stated at oral argument that, like his Section 1981 claim, he intends to plead two distinct Section 1983 claims: one arising out of the non-renewal of the 2007 Contract and one arising out of the failure to hire him for the 2010 Contract. This point is also clarified in Plaintiff's brief. (D.I. 7 at 15 ("[T]he § 1983 claims for race discrimination in the non-renewal of Plaintiff's original contract and in the denial of hiring him for the new contract (Compl. Count II) are adequately pled . . . .")) Because the requirements for Plaintiff's Section 1983 claim are so similar to those of his Section 1981 claim, Plaintiff's respective Section 1983 claims fail and succeed, respectively, for the same reasons that his Section 1981 claims do.

Plaintiff's Section 1983 claim for non-renewal suffers from the same problem as does his Section 1981 claim for non-renewal: the failure to plead sufficient facts to give rise to an inference of discrimination. Plaintiff has alleged no more facts in support of his Section 1983 claim regarding DTCC's failure to renew the 2007 Contract than he did for his Section 1981 claim arising out of the same facts. Even construing the Complaint in the light most favorable to Plaintiff and accepting all well-pled allegations as true, there are insufficient bases presented upon which the Court may conclude that Plaintiff was "selectively treated" in the non-renewal of the 2007 Contract and that it was not renewed because of "an intention to discriminate on the basis of . . . race." *Hennis*, 2011 WL 6780692, at *3.

Similarly, just as Plaintiff's Section 1981 claim for failure to hire under the 2010 Contract survives Defendants' Motion, the Court finds that his Section 1983 failure to hire claim is also

35

sufficient to withstand the Motion. As discussed above, in support of his Section 1981 claim,

Plaintiff has adequately alleged both that: (1) he was treated differently than similarly situated

individuals—specifically, that he was treated differently than Outdoor, a landscape company like

Plaintiff's that was competing for the same work; and (2) that such selective treatment was

motivated by an intention to discriminate on the basis of race. For purposes of a Rule 12(b)(6)

analysis, Plaintiff has adequately pled his claim. *See Chan v. Cnty. of Lancaster*, Civil Action

No. 10-cv-03424, 2011 WL 4478283, at *14-15 (E.D. Pa. Sept. 26, 2011) (holding that, on a

motion to dismiss, "a general allegation that plaintiff has been treated differently from others

similarly situated will suffice" and denying motion to dismiss where plaintiff had alleged that

Caucasians holding similar positions were not disciplined for engaging in certain activities,

whereas plaintiff was disciplined for similar alleged misconduct).

For these reasons, the Court recommends that Defendants' Motion with respect to

Plaintiff's Section 1983 claim for failure to renew the 2007 Contract be granted, and Defendants'

Motion with respect to DTCC's failure to hire as to the 2010 Contract be denied.

## C.    Qualified Immunity of Individual Defendants

Defendants' last argument is that the claims against the Individual Defendants should be

dismissed pursuant to the doctrine of qualified immunity. "Qualified immunity shields federal

and state officials from money damages unless a plaintiff pleads facts showing (1) that the

official violated a statutory or constitutional right, and (2) that the right was 'clearly established'

at the time of the challenged conduct." *Ashcroft v. al-Kidd*, — U.S. —, 131 S.Ct. 2074, 2080

(2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "It is the burden of a defendant

official asserting qualified immunity to establish an entitlement to the same." *Neuberger v.*

*Gordon*, 567 F. Supp. 2d 622, 638 (D. Del. 2008) (citations omitted).

The Individual Defendants' primary argument in support of the application of this doctrine here is that Plaintiff has failed to sufficiently plead the violation of any constitutional or statutory rights, much less "clearly established" ones. (D.I. 5 at 15)  Instead, Individual Defendants argue, Plaintiff's allegations, at most, show only that Individual Defendants wrongfully exercised their discretion in a contract bid process, a showing that is not enough to overcome their qualified immunity.  (*Id.*)  Plaintiff disagrees, arguing that he has sufficiently alleged a violation of his clearly established right to be free from racial discrimination. (D.I. 7 at 15)

Focusing on the grounds at issue here regarding the qualified immunity claim, the Court finds that the Individual Defendants have not met their burden of establishing that they are entitled to that immunity. As discussed above, the Court finds that Plaintiff has sufficiently pled claims for racial discrimination with respect to the 2010 Contract pursuant to Section 1981 and Section 1983. That Plaintiff has the right to be free from racial discrimination in the making and enforcing of contracts and his right to equal protection of the law is clearly established. *Wilson v. Taylor*, 466 F. Supp. 2d 567, 574 (D. Del. 2006) (denying motion to dismiss on the basis of qualified immunity and noting that "[t]he right to be free of racial discrimination is a clearly established Constitutional right"); *see also Williams v. Richland Cnty. Children Servs.*, 489 F. App'x 848, 854 (6th Cir. 2012) (affirming denial of qualified immunity defense where plaintiff adequately pled claims pursuant to Section 1981 and 1983 and observing that "[i]f any 'right' under federal law is 'clearly established,' it is the constitutional right to be free from racial discrimination. Not only is this obligation 'clearly established,' but it is evident from the face of

37

[Section 1981 and the Equal Protection Clause].") As the Individual Defendants' only argument

in support of their qualified immunity defense is that Plaintiff has not alleged the violation of a

clearly established right, the defense must fail on that ground.

### D.    Nature of Dismissal

As noted above, Plaintiff has failed to allege sufficient facts to make out a plausible claim

for relief on either Count of the Complaint that is directed at DTCC's decision not to renew the

2007 Contract. However, in this jurisdiction, a court must generally grant leave to amend before

dismissing a pleading asserting claims of this variety that are merely deficient. *See, e.g.*, *Shane v.*

*Fauver*, 213 F.3d 113, 116–17 (3d Cir. 2000). "Dismissal without leave to amend is justified

only on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d

229, 236 (3d Cir. 2004). There is no evidence here that Plaintiff has acted improperly or in bad

faith, and Plaintiff has not yet sought to amend his pleading. Although Defendants essentially

argue that Plaintiff's claims are futile, the Court recommends that at this early stage, and based

on the incomplete record currently before it, Plaintiff should be granted leave to amend. *See,*

*e.g.*, *Knight*, 2011 WL 3665379, at *3 (stating that "in a civil rights case, a court must allow a

plaintiff leave to amend the complaint unless it would be inequitable or futile to do so") (citing

*Phillips*, 515 F.3d at 245); *see also Hudson v. Aaron Rental Co., Inc.*, C. A. No. 09-332 (GMS),

2010 WL 2679863, at *5 (D. Del. July 6, 2010).

### IV.    CONCLUSION

For the above reasons, I recommend that the Court GRANT Defendants' Motion to

dismiss Plaintiff's claims that arise out of DTCC's decision not to renew the 2007 Contract, but

do so without prejudice to allow Plaintiff the opportunity to file an amended complaint that

38

addresses the factual and legal deficiencies outlined above.  I further recommend that the Court

DENY the remainder of Defendants' Motion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b).  The failure of a party to object to legal conclusions may result in the loss

of the right to de novo review in the district court.  *See Henderson v. Carlson*, 812 F.2d 874, 878-

79 (3d Cir. 1987); *Sincavage v. Barhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order in Non-Pro Se Matters For

Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is

available on the District Court's website, located at http://www.ded.uscourts.gov.


Dated:  May 1, 2013

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE