## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL C. MILLER, SR. d/b/a<br>MILLER'S LAWN SERVICE, | )<br>) |
| | ) |
| Plaintiff, | )<br>) |
| | ) |
| v. | )    Civil Action No. 12-216-SLR-CJB |
| | ) |
| DELAWARE TECHNICAL &<br>COMMUNITY COLLEGE, LINFORD<br>P. FAUCETT, III, GEORGE E.<br>BOOTH, ROBERT W. HEARN, JR.,<br>KYLE L. SERMAN, and H. ALLAN<br>SCHIRMER, each individually and in their<br>official capacities, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| | ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

In this action filed pursuant to 42 U.S.C. §§ 1981 and 1983, Plaintiff Michael C. Miller,

Sr., d/b/a Miller's Lawn Service ("Plaintiff"), brought suit against Defendant Delaware Technical

& Community College ("DTCC" or "the College") and Defendants Linford P. Faucett, III,

George E. Booth, Robert W. Hearn, Jr., Kyle L. Serman, and H. Allan Schirmer, in their

individual and official capacities (collectively, "Individual Defendants"). Presently pending

before the Court is Defendants' Motion for Summary Judgment ("Motion"). (D.I. 42) For the

reasons set forth below, the Court recommends that the Motion be DENIED.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    The Parties

1

Plaintiff, an African-American male and Delaware resident,[1] is the owner and operator of a landscaping business known as Miller's Lawn Service ("Miller's"), a sole proprietorship. (D.I. 45 at A002 at ¶ 5, A019 at ¶ 3; D.I. 46 at A313) Defendant DTCC is an institution of higher education created by Delaware state statute in 1966. (D.I. 43 at 2 (citing Del. Technical & Cmty. Coll., *History*, https://www.dtcc.edu/about/history (last visited June 10, 2015))) DTCC operates on four locations in Delaware, including the Jack F. Owens Campus ("the Campus" or "Owens Campus") located in the town of Georgetown. (*Id.* (citing Del. Technical & Cmty. Coll., *Our Campuses*, https://www.dtcc.edu/our-campuses (last visited June 10, 2015))) The one-hundred forty-seven acre Owens Campus is known as DTCC's "birthplace." (*Id.* (citing Del. Technical & Cmty. Coll., *Our Campuses—Georgetown*, https://www.dtcc.edu/our-campuses/georgetown (last visited June 10, 2015))) Since 2007, DTCC has employed three landscaping contractors at the Owens Campus: (1) Miller's, from 2007 to 2010; (2) Outdoor Design Group ("Outdoor"), from 2010 to 2013; and (3) Priority Services ("Priority"), from 2013 through the present. (D.I. 45 at A005 at ¶ 13, A025 at ¶ 20; D.I. 46 at A378.1, A380, A400, A443)

The Individual Defendants served on a five-person panel (the "committee") assigned the task of scoring bidders to award the 2010-2013 landscaping contract for the Owens Campus. (D.I. 46 at A345) All five men are Caucasian. (D.I. 45 at A002-3 at ¶¶ 7-11, A019-21 at ¶¶ 5-9) Defendant Faucett was the head of the committee, and at all times relevant to the Complaint was the Director of Administrative Services at the Owens Campus. (D.I. 46 at A345, A447) Defendant Faucett reported to the Campus Director in charge of the Owens Campus, Dr. Ileana

---

[1]     Plaintiff also asserts that he is a Nanticoke Indian, (D.I. 45 at A002 at ¶ 5; D.I. 46 at A313-14), but his claims are based solely on his racial identity as an African-American, (D.I. 44 at 2 n.8; D.I. 53 at 109).

Smith. (*Id.* at A336, A521) Defendant Booth served at all times relevant to the Complaint as the Assistant Director of Administrative Services at the Owens Campus; he was Defendant Faucett's "right-hand man" and direct report. (D.I. 45 at A002 at ¶ 8, A019-20 at ¶ 6; D.I. 46 at A345.1) Defendant Schirmer served at all times relevant to the Complaint as the Superintendent of Grounds at the Owens Campus and also reported to Defendant Faucett. (D.I. 45 at A020 at ¶ 9; D.I. 46 at A474-75) Defendant Serman served at all times relevant to the Complaint as the Chair of the Department of Applied Agriculture and was based at the Owens Campus. (D.I. 45 at A003 at ¶ 10, A020 at ¶ 8) Defendant Hearn served at all times relevant to the Complaint as the Business Manager at Owens Campus. (*Id.* at A003 at ¶ 9, A020 at ¶ 7)

## 2. 2007 Contract

### a. Events relating to the bidding process

In September 2006, DTCC published an advertisement in the *The News Journal*, soliciting bids for the landscaping contract with the Owens Campus for the period of January 2007 through January 2010 (the "2007 Contract"). (D.I. 43, ex. C at 28) For this contract, DTCC utilized the "lowest responsible bidder" competitive bidding process, which awards the contract to the "lowest responsive and responsible bidder whose bid conforms in all material respects to the requirements and criteria" set forth in the invitation to bid. (D.I. 43 at 3 (quoting Del. Code tit. 29, § 6923)) In an initial round of bidding, seven companies, including Miller's, submitted bids. (*Id.*, ex. C at 28) Plaintiff was not the lowest bidder. (*Id.* at 29) There was a large disparity of pricing in the bids, and for that reason, DTCC requested that the companies rebid for the contract. (*Id.* at 30) This time, Plaintiff was the lowest bidder. (*Id.* at 29-30; D.I. 46 at A410) Ultimately, the selection committee recommended to Dr. Smith that the 2007

3

Contract be awarded to Plaintiff. (D.I. 43, ex. L at 30)

The 2007 Contract was thereafter awarded to Plaintiff. (D.I. 45 at A005 at ¶ 13, A025 at ¶ 20) In a December 2006 letter, Defendant Faucett informed Plaintiff that "[t]he College has high expectations with your company to bring the appearance of the grounds up to and beyond acceptable standards of landscaping. I want this College to reflect a showplace and will accept nothing less." (D.I. 43, ex. A)[2] In January 2007, Miller's and DTCC executed a written contract, (*id.*, ex. I at D0327), and DTCC elected to make the contract effective on February 1, 2007, (*id.*, ex. H). The 2007 Contract included a termination option that permitted DTCC to terminate the contract "in its sole discretion in the event that the services are not performed to its satisfaction in its sole discretion." (*Id.*, ex. I at D0322; *see also* D.I. 46 at A360.1, A480.1) Plaintiff was retained for the entire three-year term of the 2007 Contract. (D.I. 46 at A415.1, A480.1, A528.1)

### b. Plaintiff's behavior

Defendants assert that "[f]rom the inception of the 2007 Contract, Plaintiff exhibited a pattern of unnecessarily litigious and argumentative behavior." (D.I. 43 at 4)[3]

For example, Defendant Faucett testified that Plaintiff "had a tendency to pick people that

---

[2]      According to Defendants, DTCC conveyed this message to "each" of its landscaping contractors, though in support, Defendants cite only to a letter sent to Plaintiff. (D.I. 43 at 2-3 & n.6-7)

[3]      Even prior to the inception of the 2007 Contract, Defendants assert that Plaintiff raised an issue with a clause in a draft version of the contract, (D.I. 43, ex. E at 6; *id.*, ex. G at 1; *id.*, ex. I at D0326), and they claim that Plaintiff threatened legal action over the issue if it was not resolved satisfactorily, (*id.*, ex. G). During this dispute, Defendant Faucett (referring to Plaintiff) wrote in an internal DTCC e-mail: "I am not willing to work with an individual who goes behind people's back[s] to get his way and manipulates and bull[ies] his opinion. . . . I do not want this person working for the college. I have a bad feeling about him and his tactics[.]" (*Id.*; *see also* D.I. 46 at A350) The parties ultimately resolved this contract issue, and Miller's thereafter began working at DTCC. (D.I. 43, exs. H & I)

4

he thought he could bully, like women, and I had one particular instance [where] two [female] employees [were] in my office . . . and he took advantage of them by being abusive and loud and even causing one to break down and cry." (*Id.*, ex. C at 166) Further, Defendant Faucett claimed that various employees had to talk to Plaintiff about the way he was doing things—specifically: "Mr. [Terry] Hastings [then-Superintendent of Grounds and the point of contact with Plaintiff for DTCC] had problems with him. Mr Schirmer had problems with him. Mr. Booth had a confrontation with him. At various times, [Defendant Faucett] had him in [his] office where [he] had to discuss different matters with" Plaintiff. (*Id.* at 172; *see also* D.I. 43 at 7 (citing *id.*, ex. P); D.I. 46 at A476)

The recollections of other DTCC employees as to Plaintiff's demeanor are also in the record. Defendant Schirmer testified that he never "butted heads" with Plaintiff. (D.I. 46 at A476) Defendant Booth testified that Plaintiff was "somewhat confrontational and argumentative[,]" though he could not recall any specific examples of such behavior. (D.I. 43, ex. M at 97; D.I. 46 at A405-06) Defendant Booth thereafter described Plaintiff as "[n]ot aggressive and not real confrontational, but negative as in attitude . . . . [j]ust not the most upbeat of people[.]" (D.I. 43, ex. M at 97) When asked if Plaintiff was ever argumentative and defensive, Dr. Smith replied "[y]es," but she also stated that Plaintiff was respectful and professional in his interactions with her. (D.I. 43, ex. L at 20; D.I. 46 at A526) And Terry Johnson, the Owens Campus's Dean of Student Services from 2004 through December 2009, reported that he never witnessed Plaintiff argue with anyone or raise his voice at anyone. (D.I. 46 at A536-37, A539)

### c. **Plaintiff's performance**

5

Defendants allege that Plaintiff "struggled mightily" under the 2007 Contract, and was "unable to maintain the 'showplace' effect the College administration clearly desired." (D.I. 43 at 5-7)

For example, according to Defendant Faucett, Plaintiff: (1) "did not get all of the weeds that we were asking him to get;" (2) had to be told more than once to get the ditches and tax ditches cut; (3) pruned trees much higher than DTCC wanted;[4] (4) caused a "hay-looking situation" where Plaintiff cut the grass and failed to dispose of leftover grass clippings; (5) sprayed a herbicide underneath white pine trees to attack weeds, which stressed the trees so badly that they dropped their needles and looked dead (before eventually returning to health);[5] (6) covered people's cars with grass clippings on a couple of occasions;[6] and (7) occasionally sprayed herbicides in flower beds, killing flowers instead of weeds. (*Id.*, ex. C at 166-68) Defendant Faucett also prepared a document titled "Comments on Meeting 4/25/07 with Mike

---

[4]      Plaintiff trimmed fifteen trees and invoiced DTCC separately for this work because it was outside of the scope of his contract. (*Id.*, ex. N) In September 2008, Defendant Faucett sent Plaintiff a letter indicating that he was not "satisfied with the height of your trimming and the price of $90.00 per tree was not what you originally quoted at $75.00 per tree." (*Id.*)

[5]      Plaintiff testified that Defendant Faucett yelled at him about the trees, but that he told Defendant Faucett that he had not sprayed any trees, and that he knew what he was doing. (D.I. 46 at A322-23) Plaintiff explained to Defendant Faucett that the weather had been "cold, warm, cold, warm" and the "[t]rees don't know exactly what they're doing. They will come out[.]" (*Id.*) Plaintiff stated that these trees thereafter were "still standing and doing just fine." (*Id.* at A322)

[6]      On November 1, 2007, a DTCC visitor e-mailed Defendant Faucett's assistant, Jean Eaton, to report that he found his vehicle covered in grass and dirt after the grass had been cut, and that this had also happened on previous occasions. (D.I. 43, ex. Q) The e-mail writer stated that he was "thoroughly disgusted by this vendor[']s lack of respect for others['] property." (*Id.*)

6

Miller" in which he noted that there were still "many weeds that needed to be sprayed or pulled throughout the campus." (*Id.*, ex. R) He also wrote that "Miller needs not to worry about past performers and to treat this contract as coming in at a starting point and doing the best he can to produce a showplace. *No excuses* will be acceptable as to non-performance of this contract on Miller's behalf." (*Id.* (emphasis in original))

Defendant Schirmer also described deficiencies in Plaintiff's performance under the 2007 Contract. He noted that Plaintiff: (1) told him that drains clogged by leaves were not Plaintiff's problem (although Defendant Schirmer acknowledged that Plaintiff did later take care of removing leaves from these drains), (*id.*, ex. J at 26, 28); (2) did not cut ornamental grasses (because Plaintiff typically cut them in the Spring), leaving Defendant Schirmer to cut these grasses himself in the Fall, (*id.* at 26-28);[7] (3) did not remove weeds from a garden in the Child Development Center on the Campus (and that Plaintiff later asserted that he did not know that this was his responsibility), leaving Schirmer to do it, (*id.* at 27); (4) left flower beds full of grass, (*id.* at 77); (5) did not take out mulch that "somebody" put in "over the years," which was six to eight inches deep in places, and which caused a couple of big trees to rot, (*id.* at 156); and (6) overall, "[d]id not" meet the contract requirements, (*id.* at 77).

Defendant Schirmer took photographs of the landscaping at the Owens Campus, which are in the record. (*Id.*, ex. K; *see also* D.I. 46 at A506) The date on which he took these photographs is not exactly clear from the record, however, as the photographs themselves are not

---

[7]     Plaintiff produced a document entitled "Tips and Timing for Cutting Back Ornamental Grass" indicating that cool season ornamental grass can be trimmed back on the first balmy, late Winter or early Spring day, and that warm season grasses can be cut back in late Spring. (D.I. 45 at A039-41)

marked with any date. (D.I. 43, ex. K)[8] Defendant Schirmer testified that he took the photographs "[i]n about the end of September, 1st of October. It was the end of [] September." (D.I. 46 at A507) When asked what year this was, he responded, "2010, I think." (*Id.*) But Defendant Schirmer also testified that the pictures were taken during the time that Plaintiff held the Owens Campus contract (i.e., from February 1, 2007 through January 31, 2010). (*Id.*) When asked if he took the pictures in September of the "last year when Miller's" had the contract, Defendant Schirmer responded, "[t]hat's the only time I had anything to do with the contract," and then said that he took the photographs after he "took over as Superintendent of Grounds[.]" (*Id.*) However, Defendant Schirmer became Acting Superintendent of Grounds in approximately July 2010, and became Superintendent of Grounds approximately July 1, 2011. (*Id.* at A356, A473-74)[9]

As for Dr. Smith, she recalled "times during the [2007] contract when it was [her] observation that the grass might be too tall or there might be weeds, like in the pavement or around beds. . . . and I also observed there might be mulch needed in areas." (D.I. 43, ex. L at 24) Dr. Smith complained to Defendant Faucett that "the grass was too tall, that the weeds needed to be pulled in certain areas. . . . that we needed to edge something or to . . . do the

---

[8]     Defendants allege that Defendant Schirmer took the pictures "of the substandard work and outright 'neglect' in order to have proof of Plaintiff's poor performance[,]" (D.I. 43 at 6), and they cite to a particular page of Defendant Schirmer's deposition transcript in support, (*id.* at 6 & n.44 (citing D.I. 43, ex. J at 140)). However, this page is missing from Defendants' submission, (*see* D.I. 43, ex. J), and does not appear in subsequent appendixes submitted by the parties, (D.I. 46, 48).

[9]     According to Defendant Schirmer, he did not take any photographs of Outdoor's work. (D.I. 48, ex. G at 158)

8

manicuring of the lawn." (*Id.* at 27)[10]

Defendant Booth, for his part, made one complaint to Plaintiff during his tenure, relating to the distribution of mulch in plant and flower beds. (D.I. 43, ex. M at 16) The mulch depth should have been around two or three inches deep, but in certain beds the mulch was "dumped with a bucket and just spread around" such that it was eight to ten inches thick. (*Id.*)

Defendants put into the record other evidence of problems with Plaintiff's work. For example, Plaintiff's employees caused window damage on two occasions in mid-2007. (*Id.*, ex. O) Defendants also contend that Plaintiff neglected certain areas of the Campus, pointing to two May 23, 2007 work orders directed to Mr. Hastings. (D.I. 43 at 7 (citing *id.*, ex. P)) One of these work orders notes weeds in certain locations and requests that a particular area be leveled out and seeded; however, the document also notes that "[w]e are thrilled with the work so far." (*Id.*, ex. P) The second work order states that "[o]ur playground seems to be an area which the lawn service continually forgets about. We have an enormous amount of clover [] and long grass. We just wanted to make a note so that once our playground renovations are complete we get back on the radar." (*Id.*)

Plaintiff disputes the notion that he struggled mightily under the Contract, citing to other portions of the record. (D.I. 44 at 8-11) For example, Defendant Schirmer reported that Plaintiff

---

[10] Defendants also claim in their opening brief that "[w]hen asked whether she was 'pleased with [Plaintiff's] performance' [Dr. Smith] answered: 'I would have to say that no, overall, the inconsistences and the lack of attention to detail did not please me.'" (D.I. 43 at 6) However, Defendants failed to provide a citation for this testimony, (*see id.*), and the pages of Dr. Smith's testimony that Defendants did submit did not include these statements, (*see id.*, ex. L). Defendants reiterate this testimony in their reply brief, this time providing a citation to page 82 of Dr. Smith's deposition. (D.I. 47 at 4 & n.60) Again, however, Defendants failed to include this page in the Appendix that accompanied their reply brief. (D.I. 48, ex. L)

9

"did a very good job cutting grass. He was there every week. Did a great job." (D.I. 46 at A509) During a chance meeting with Plaintiff in the spring of 2013, former Dean Johnson told Plaintiff that, with regard to Plaintiff's work under the 2007 Contract, Plaintiff "'did a good job.'" (*Id.* at A541) Defendant Hearn testified that he had not personally observed any issues with Plaintiff's performance, (*id.* at A424-25), and Defendant Serman did not make any complaints about Plaintiff's work, (*id.* at A452). Defendant Booth testified that he assumed that Plaintiff had the Campus ready for the Gala, an important annual fundraiser, for all three years of his contract. (*Id.* at A402-03)[11] Dr. Smith remembers Plaintiff asking her how the grounds looked at some point during the period of the 2007 Contract (either at a Gala or right before a Gala), and she told him that "the grounds look great." (*Id.* at A526)[12]

### 3. 2010 Contract

#### a. Lead up to the bidding process and DTCC's solicitation of bids

Although the 2007 Contract was renewable for another two-year period if both parties agreed, (D.I. 43, ex. I at D0321), Defendant Faucett made the decision not to renew the contract and to instead re-bid it, (D.I. 46 at A361). Dr. Smith supported this decision as being in the "best interest" of DTCC. (D.I. 43, ex. L at 45) Plaintiff's contract ended on January 31, 2010. (D.I.

---

[11]     Defendant Faucett testified that in 2000 or 2001, a company known as Trugreen held a landscaping contract for only 60 days, (D.I. 46 at A344), when Defendant Faucett made the decision to terminate the contract because "[t]hey were not keeping up with the grounds cutting, and . . . they . . . were not going to have the campus ready in time for the Gala," (*id.* at A386; *see also id.* at A352.1 (agreeing that he decided to terminate Trugreen's contract because their performance was not satisfactory)).

[12]     For his part, when asked if Plaintiff "performed the landscaping duties and ground maintenance under his contract[,]" Defendant Faucett responded that Plaintiff "cut the grass, that is correct." (*Id.* at A352.1) When asked the same question, Defendant Schirmer answered "[y]eah." (*Id.* at A478.1-78.2)

10

On February 26, 2010, DTCC posted an advertisement in *The News Journal* to announce
to the public the bidding process for the Owens Campus landscaping contract (the "2010
Contract"). (D.I. 43, ex. F at D9) DTCC had decided not to utilize the lowest responsible bidder
process for the bidding. Instead, DTCC listed five evaluation factors (and the weight assigned to
each) on which bidding companies would be scored, and also added an interview component to
the selection process. (D.I. 43 at 7 (citing Del. Code tit. 29, § 6924); *id.*, ex. F at D9; D.I. 46 at
A421-22) The evaluation factors (and their respective weights) were the following: (1) price
(50%); (2) geographical location (5%); (3) capacity to meet requirements (15%); (4)
demonstrated ability and scope (15%); and (5) experience and reputation (15%). (D.I. 43, ex. F
at D9; D.I. 46 at A421) According to Defendant Serman, the advertisement stated that
"'[i]nterviews for selected firms will occur on March 21, 2010.'" (D.I. 46 at A468; *see also* D.I.
43, ex. F)[13] Defendant Hearn testified that DTCC decided to use this new bidding process
because the committee wanted bidders to have to submit some "professional certifications[.]"
(D.I. 46 at A420)

Next, DTCC sent out a Request for Proposals ("RFP") for the 2010 Contract that
included a list of items that each bidder was required to furnish with its bid proposal. (*Id.* at
A110-31, A416-17) These items included (but were not limited to): (1) "[p]roof of [b]usiness
[l]icenses"; (2) "[p]roof of State pesticide applicator's license in the name of the business owner,
principal or key officer"; and (3) "[p]roof of certification as a landscape professional by the

---

[13]     The copy of the advertisement provided by Defendants is largely illegible. (D.I.
43, ex. F)

11

Delaware Nursery & Landscape Association ['DNLA'] or equivalent certification by a national or state trade group recognized within the industry" that is "in the name of the business owner, principal or key officer." (*Id.* at A113; *see also id.* at A362, A395, A454, A483) A bidder's failure to provide the listed items would result in the bidder's disqualification. (*Id.* at A112, A417, A496, A529) The bidding company had the burden of providing the proper proofs. (*Id.* at A496.1) It was the responsibility of the committee to make sure the bidders in fact met all of the qualifications. (*Id.* at A530)

## b. Submission of bids

In March 2010, DTCC held a pre-bid meeting, which was attended by six companies. (D.I. 43, ex. C at 58) Thereafter, seven companies, including Miller's and Outdoor, submitted bids for the 2010 Contract. (*Id.* at 77)

With respect to the requirement to provide proof of business licenses, according to Defendant Serman, bidders for the 2010 Contract were required to submit proof of Delaware State and Georgetown (Delaware) business licenses. (D.I. 46 at A461-62; *cf. id.* at A362 (Defendant Faucett confirming that the RFP required bidders to submit "business *licenses, plural*") (emphasis added)) Outdoor submitted a 2010 Delaware State Business License, but not a business license from the town of Georgetown. (*Id.* at A372; *see also* D.I. 48, ex. D) With respect to the requirement for a pesticide applicator's license, Outdoor submitted a "copy of [a] pesticide license number for Ken Anderson [who is] currently [] our turf manager in charge of all pesticide application throughout the tri-state region." (D.I. 48, ex. D) And as for the required proof of certification by the DNLA (or its equivalent), Outdoor noted that it attached to its proposal "a copy of application for registration to [DNLA] as well as Delaware Grounds

12

Management Association." (*Id.*; *see also* D.I. 46 at A435)[14] With respect to the Delaware

Grounds Management Association, Outdoor attached a receipt for a March 18, 2010 $50.00

check, paid to the Delaware Grounds Management Association for an "[a]ssociation [f]ee" and a

print out from the entity's website indicating that to "[j]oin," one should access the membership

form on the website and send a check in the amount of $50.00. (D.I. 48, ex. E)

Following the submission of proposals, certain companies were immediately eliminated,

either because they lacked the necessary equipment or because they lacked the required

certifications or business licenses. (D.I. 43, ex. C at 127-28) The committee met on March 24,

2010 to score the remaining bidders and determine which companies they would interview. (*Id.*,

ex. S; D.I. 46 at A422) Pursuant to that process, another company was eliminated for having a

non-responsive proposal. (D.I. 43, ex. S) Outdoor was not disqualified at this stage, and it,

along with Miller's and Priority, were selected for interviews. (D.I. 46 at A433, A485-86)

### c. Interview component and feedback from references

On March 31, 2010, the committee conducted interviews with Plaintiff (on behalf of

Miller's), Outdoor, and Priority. (*Id.* at A485; D.I. 43, ex T) Of the representatives for the three

interviewing companies, Plaintiff was the only African-American; Outdoor and Priority's

representatives were Caucasian. (D.I. 46 at A331, A456, A481, A486-87)

According to Defendant Faucett, Outdoor and Priority gave "very good presentations"

with "outstanding pictures." (D.I. 43, ex. C at 170) Both companies' references also gave "rave

reviews" and said the companies had done an "excellent job." (*Id.* at 173-74) Furthermore, in

---

[14]    For his part, Plaintiff submitted the necessary documents regarding these three
requirements. (D.I. 46 at A132-33, A135-36, A363, A396, A436, A495, A503-04)

conjunction with its sealed proposal, Outdoor provided a list of fifty-one contracts held in the years 2006 through 2008 of similar size and scope to the Owens Campus. (*Id.*, ex. U)

For his presentation, Plaintiff provided the committee with pictures of his work at the Owens Campus during the past three years. (*Id.*, ex. C at 170) According to Defendant Serman, Plaintiff "did not do very well in his presentation[.]" (D.I. 46 at A471) Additionally, according to Defendant Faucett, one of Plaintiff's references said that Plaintiff had an "'[a]ttitude problem; doesn't take criticism well; likes to argue.'" (D.I. 43, ex. C at 174)

### d. Scoring of the applicants

Following the interviews, the Individual Defendants each separately scored the finalists, taking into account the five factors/criteria referenced above, as well as the interview process. (*Id.*, ex. T)[15] The five committee member scores were added together to provide for a total score. (*Id.*) Outdoor received the best score of 482 points, followed by Priority with a total of 439 points and Miller's with 399 points. (*Id.*)

With regard to the factor concerning geographic location, Defendant Schirmer and Defendant Hearn explained that this was an objective category with specific point values that did not involve the use of discretion. (D.I. 46 at A429, A493)[16] Outdoor's bid proposal stated that it

---

[15]     Dr. Smith, for her part, understood that the committee was to score each of the bidders based on certain objective criteria. (D.I. 46 at A531-32) However, Defendant Hearn acknowledged that "if you wanted to manipulate numbers [to favor the applicant that DTCC preferred], you could" do so through the use of these five factors (with the exception of the factor regarding geographic location), since the scoring process as to the factors involved the use of some committee member discretion. (*Id.* at A426-27)

[16]     If a bidder's main office was in Sussex County (the county in Delaware in which the Owens Campus was located), it was to receive 5 points; if its main office was elsewhere in the State but it had a location in Sussex County, it was to receive 4 points; if the firm's main office was out of state but it had a branch in Sussex County, it was to receive 3 points; if the

14

had two geographic office locations—one in Maryland and another on DuPont Boulevard in Georgetown, Delaware. (*Id.* at A152, A434) Defendant Schirmer recalled speaking with a representative of the United States Postal Service, who said that the DuPont Boulevard address was Outdoor's. (D.I. 48, ex. G at 108) But Defendant Faucett explained that DTCC eventually called the DuPont Boulevard location; when they did so, they learned that Outdoor did not yet have a permanent location in Georgetown. (D.I. 46 at A365-67) Instead, an equipment rental company called Iron Source was located at the DuPont Boulevard address. (*Id.* at A367, A369, A494) DTCC spoke to Kenny Adams, whose company, Melvin L. Joseph & Sons Construction Company, owned the DuPont Boulevard location. (*Id.* at A365-66) Mr. Adams stated that he and Rich Crouse (an Outdoor representative who interviewed with DTCC during the 2010 bidding process) were negotiating to enter into a partnership that would use the DuPont Boulevard location to rent equipment. (*Id.*) Those negotiations were never successfully completed, however, and Outdoor never opened an office at the DuPont Boulevard address or at any other Georgetown location. (*Id.* at A365-68) All five members of the committee ultimately gave Outdoor a score of 4 for the geographical location factor (that is, a score that, according to DTCC's bidding rules, was intended to reflect that a company's main office was elsewhere in Delaware, but that the company had an office location in Sussex County). (*Id.* at A153-57)

With respect to the "price" factor, Defendant Hearn viewed it as an objective factor, in the sense that the highest score should go to the lowest bidder. (*Id.* at A428, A431) Defendant Serman also acknowledged that "[i]f one company submitted the lower bid, they would get a

---

firm's main office was out of state but it had a branch office in Kent County or New Castle County (Delaware's other two counties), it would receive 1 point; and if all of the firm's locations were out of state, it was to receive zero points. (*Id.* at A153, A429-30)

15

higher score." (*Id.* at A465) Defendant Faucett interpreted it differently, seeing it as "subjective" and involving a score that focused not only on the dollar figure of the bid, but also on the quality that DTCC would receive for that price. (*Id.* at A389-90) And, in Defendant Schirmer's eyes, although the price factor was allocated the greatest amount of points, it was not necessarily the "most important" factor. (*Id.* at A497)

Ultimately, Outdoor submitted the lowest bid, at $65,750 per year. (D.I. 43, ex. C at 132; *see also id.*, ex. V) Miller's price was the second lowest, at $68,868 per year. (D.I. 46 at A490-91) Priority's price was the highest of the three, at $82,000 per year. (*Id.* at A364) Defendant Faucett gave Plaintiff a score of 43 for price, gave Priority a score of 45 and gave Outdoor a score of 47. (*Id.* at A152.1-53) Defendant Schirmer gave both Plaintiff and Priority the same score of 45 for the price factor; he gave Outdoor a 48. (*Id.* at A154, A491)

In the end, Plaintiff's bid was not successful. (D.I. 45 at A014 at ¶ 70, A029 at ¶ 28; D.I. 46 at A378.1) In April 2010, DTCC awarded the 2010 Contract to Outdoor. (D.I. 46 at A374, A378.1, A441-42) The contract commenced on April 1, 2010 and was to remain in effect until March 31, 2013, although it contained an option for further renewal for a period of up to two years, upon the mutual written consent of Outdoor and DTCC. (*Id.* at A158)

### e. Outdoor's performance

During Outdoor's 2010 Contract, Defendant Schirmer testified that there were "[a]bsolutely" weeds on campus. (*Id.* at A492) He also acknowledged that just as with Plaintiff's work, there were times during the 2010 Contract period when leaves would accumulate on Campus, and he would have to call Outdoor and ask it to remove the leaves. (*Id.* at A502) And Outdoor did "the same thing that [Plaintiff] was doing" with respect to

16

deficiencies regarding grass cutting in and around tax ditches. (*Id.* at A500-01) Like Plaintiff, Outdoor also broke some windows on Campus. (*Id.* at A499)

### 4. 2013 Contract

Near the conclusion of Outdoor's contract, Defendant Schirmer was in favor of rebidding it. (*Id.* at A504-05) Meanwhile, Defendant Faucett wrote in a September 2012 e-mail that he was "pleased with [Outdoor's] work" and was going to ask Outdoor if it was interested in a contract extension. (*Id.* at A309, A379) Ultimately, however, Outdoor stopped showing up to the Owens Campus by January 2013 (two months in advance of the March 2013 contract completion date); as a result, Defendant Faucett did not offer Outdoor the option to renew the contract. (*Id.* at A378.2-80)

Instead, DTCC awarded the new contract ("the 2013 Contract") to Priority. (D.I. 43, ex. C at 162; D.I. 46 at A400) No bidding took place for the 2013 Contract. (D.I. 46 at A380) DTCC elected to hire Priority because Priority had a contract approved by the State of Delaware; Priority was therefore considered a State vendor, such that DTCC could hire it without having to conduct a bidding process. (D.I. 43, ex. C at 162-63; *see also* D.I. 46 at A443, A533.2) Dr. Smith approved the decision to hire Priority. (D.I. 46 at A533.2)

Defendant Faucett testified that in 2013, the Owens Campus still did not "look like a showplace[.]" (*Id.* at A391) Indeed, he has never seen any landscaper achieve his goal of having the Campus look like a showplace. (*Id.* at A391-93)

### B. Procedural Background

On February 22, 2012, Plaintiff filed his Complaint, asserting claims pursuant to 42 U.S.C. §§ 1981 and 1983 with respect to: (1) DTCC's non-renewal of his 2007 Contract; and (2)

17

DTCC's selection of Outdoor for the 2010 Contract. (D.I. 1) On May 3, 2012, this case was referred to the Court by Judge Sue L. Robinson to "conduct all proceedings, including alternative dispute resolution; hear and determine all motions[], through and including the pretrial conference." (D.I. 6)

Defendants filed a motion to dismiss all claims, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (D.I. 4) The Court thereafter issued a Report and Recommendation regarding the motion to dismiss, which recommended: (1) grant of the motion to dismiss for failure to state a claim under Rule 12(b)(6), with respect to Plaintiff's claims relating to the 2007 Contract; (2) denial of the motion with respect to Plaintiff's claims relating to the 2010 Contract, on the grounds that the motion sufficiently alleged plausible claims pursuant to Rule 12(b)(6); and (3) denial of the Rule 12(b)(1) motion as to Defendants' arguments regarding Eleventh Amendment immunity. (D.I. 14)[17] The District Court later adopted the Report and Recommendation in its entirety, over Defendants' objection. (D.I. 15, 28)

The case proceeded through completion of discovery, after which Defendants filed the instant Motion. (D.I. 42) Defendants' Motion was fully briefed as of December 23, 2013, (D.I. 47), and on July 15, 2014, the Court heard oral argument regarding the Motion, (D.I. 53 (hereinafter, "Tr.")).

## II. STANDARD OF REVIEW

---

[17]     Although the Court recommended that the denial of Plaintiff's claims with regard to the 2007 Contract be without prejudice to Plaintiff's ability to amend, (D.I. 14 at 38), Plaintiff ultimately determined to proceed only on his claims relating to the 2010 Contract, (D.I. 44 at 1 n.1).

18

A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). If the moving party meets this burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587 (internal quotation marks omitted). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks and citation omitted). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Facts that could alter the outcome are "material," and a factual dispute is genuine only where "the evidence is such that

19

a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

## III. DISCUSSION

In seeking summary judgment, Defendants make two arguments. First, Defendants assert that the Eleventh Amendment of the United States Constitution immunizes DTCC and the Individual Defendants in their official capacities from liability. (D.I. 43 at 2, 9-16) Second, Defendants argue that Plaintiff has failed to adduce sufficient evidence to withstand summary judgment as to his racial discrimination claims. (*Id.* at 2, 16-20) The Court will address both arguments in turn.

### A. Eleventh Amendment Immunity

Defendants first argue that DTCC and the Individual Defendants in their official capacity are immune from suit, because DTCC is an arm of the state that is entitled to sovereign immunity pursuant to the Eleventh Amendment (and that the Individual Defendants are thus state officials who are also immunized from liability for official capacity claims). (D.I. 43 at 10; Tr. at 42-43)

The Eleventh Amendment provides:

20

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. "While the text of the Amendment does not specifically bar lawsuits against a State by its own citizens, the 'ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal courts.'" *Paoli v. Delaware*, Civil Action No. 06-462 (GMS), 2007 WL 4437219, at \*2 (D. Del. Dec. 18, 2007) (quoting *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001)). It is also well-settled that "Eleventh Amendment immunity extends to entities that are considered arms of the state." *Paoli*, 2007 WL 4437219, at \*4; *see also Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429-30 (1997). In other words, where the state is essentially the "real party in interest[,]" the Eleventh Amendment will operate to bar the suit even if the state is not named as a party to the action. *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989).

In *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989), the United States Court of Appeals for the Third Circuit adopted a three-factor test to determine whether "a suit against an entity is actually a suit against the state itself[,]" thus implicating Eleventh Amendment immunity. *Fitchik*, 873 F.2d at 659. Those factors are:

> (1) Whether the money that would pay the judgment would come from the state . . .
>
> (2) The status of the agency under state law . . . ; and
>
> (3) What degree of autonomy the agency has.

*Id.*; *see also Paoli*, 2007 WL 4437219, at \*4. All of the factors are to be considered equally, with none of them having predominant importance. *Kuhn Constr. Co. v. Diamond State Port Corp.*,

21

Civ. No. 10-637-SLR, 2011 WL 1576691, at *4 (D. Del. Apr. 26, 2011) (citing cases). That said, the Supreme Court of the United States has instructed that "in close cases, where 'indicators of immunity point in different directions,' [] the principal rationale behind the Eleventh Amendment—protection of the sovereignty of states through 'the prevention of federal-court judgments that must be paid out of a State's treasury,'[]— should 'remain [a court's] prime guide.'" *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 229-30 (3d Cir. 2006) (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47-48, 52 (1994)). The party asserting Eleventh Amendment immunity bears the burden of production and persuasion with respect to factual questions that arise in the analysis. *Id.* at 229; *Christy v. Pa. Tpk. Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995).

The Court previously considered this issue in resolving Defendants' Motion to Dismiss. *See Miller v. Del. Technical & Cmty. Coll.*, Civ. Action No. 12-216-SLR-CJB, 2013 WL 1832072, at *5-12 (D. Del. May 1, 2013) (hereinafter *"Miller I"*).[18] After analyzing each of the three *Fitchik* factors, the Court concluded that "at this stage of the litigation, there is insufficient evidence in the record for a finding that DTCC is entitled to immunity pursuant to the Eleventh Amendment." *Miller I*, 2013 WL 1832072, at *12. With respect to the *Fitchik* factors, the Court found that "[w]hile the second factor, DTCC's status under State law, weighs slightly in favor of immunity, the remaining two factors, the source of the money for a judgment and the entity's

---

[18]     In setting out its decision in this Report and Recommendation, the Court will assume familiarity with the substance of its decision in *Miller I*. The Court also incorporates by reference into this Report and Recommendation its analysis of the *Fitchik* factors as set out in *Miller I*. (*See* D.I. 43 at 9 n.73; D.I. 44 at 14 n. 58) Below, the Court will discuss how its analysis in *Miller I* would or would not be altered by the arguments raised by the parties with regard to the instant Motion.

22

autonomy, weigh against a finding of immunity (the latter slightly so). *Id.* After objection from Defendants, the District Court adopted the Court's recommendation, explaining that "although the arguments contained within [D]efendants' objections with respect to Eleventh Amendment Immunity may ultimately prove to be meritorious, [D]efendants presented [the District Court] with facts not of record before Judge Burke (and facts which may be disputable, requiring vetting through discovery)." *Miller v. Del. Technical & Cmty. Coll.*, Civ. No. 12-216-SLR/CJB, 2013 WL 5314871, at *1 (D. Del. Sept. 16, 2013).

The Court will now again analyze each of the *Fitchik* factors in order.

## 1. Source of Money for a Judgment

The first *Fitchik* factor—whether the money that would pay the judgment would come from the State—includes consideration of "whether payment will come from the state's treasury, whether the [entity] has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the [entity's] debts." *Fitchik*, 873 F.2d at 659. When it comes to the first *Fitchik* factor, "it is the [state's] legal obligation to satisfy the [entity's] debts that carries the most weight[.]" *Lang v. Pa. Higher Educ. Assistance Agency*, — Fed. App'x — , 2015 WL 1787050, at *2 n.5 (3d Cir. Apr. 21, 2015); *see also Cooper v. Se. Pa. Transp. Auth.*, 548 F.3d 296, 303 (3rd Cir. 2008) (noting that the "crux" of this analysis is "whether the state treasury is legally responsible for the payment of a judgment against the [entity]") (internal quotation marks and citation omitted).

### a. Whether payment will come from the State's treasury

As to the first sub-factor—whether payment will come from the state's treasury—the Court explained in *Miller I* that the key inquiry here is whether, after issuing funds to an entity,

23

the State "retains ownership or control of the funds [it] appropriated to" DTCC. *Febres*, 445

F.3d at 227 (noting that otherwise, "once deposited in [an entity's] accounts, these funds belong

to the [entity, such that if] used to pay a judgment, we can say only that the judgment was

satisfied with the [entity's] monies").[19] And as the Third Circuit has set out, establishing control

alone is not sufficient; rather, "state control is only significant to the funding analysis where such

control indicates state ownership of the funds." *Christy*, 54 F.3d at 1145-46 (citing *Fitchik*, 873

F.2d at 661); *see also Fitchik*, 873 F.2d at 661 n.4 (noting that state control over an entity's funds

was only significant in this context as it relates to whether the money at issue "was actually the

state's money—either because the state had an obligation to replace it, because there were

insufficient funds in the account and the state would be obligated to pay any judgment directly, or

because the state generally treated the funds as its own") (citing *Blake v. Kline*, 612 F.2d 718,

---

[19]     The Court assumes, for purposes of its analysis of this sub-factor, that (as
Defendants assert in their opening and reply briefs) "the State provides roughly fifty percent of
the College's funding[.]" (D.I. 47 at 6 & n.77; *see also* D.I. 43 at 11 & n.79) Defendants'
counsel explained that State-provided funds and the remainder of the funds DTCC raises or
obtains "are commingled[,]" and that Defendants did not believe that there exists "an accounting
that could be done to say that[] this is a tuition dollar versus a State of Delaware funded dollar in
a bank account." (Tr. at 144-45)

However, it is worth noting that even as to the issue of what percentage of DTCC's total
yearly funding is composed of State-provided funds, the record is wanting. Defendants cite to
only one document (a bill of the Delaware House of Representatives) in support of the "roughly
fifty percent" claim. But that document simply indicates that for the fiscal year ending June 30,
2012, the State provided $67,417,800 in funding to the College. H.R. 190, 146th Gen. Assemb.,
at 54 (Del. 2011), *available at*
http://legis.delaware.gov/LIS/lis146.nsf/vwLegislation/HB+190/$file/legis.pdf?open; *see also*
(D.I. 44 at 16). No record support (e.g., by way of additional documentation, or an affidavit) is
provided to indicate what *percentage* of the College's budget was made up of this award in the
fiscal year.

723-24 (3d Cir. 1979)).[20] Put differently, "state control over an entity's ability to obtain funds is inadequate to demonstrate state ownership of the funds where the state is not shown to have a financial interest that would be directly and adversely affected by the diminution of the funds in question." *Christy*, 54 F.3d at 1146.

Defendants make a number of statements in an attempt to demonstrate State ownership of DTCC funds that would be used to pay any judgment. (*See* D.I. 43 at 11 (Defendants asserting that the State has a "strict oversight and possessory interest in College funds" that "once deposited . . . are not entirely the College's monies")) The Court summarizes these statements below, and why they are not ultimately persuasive.

First, Defendants assert that DTCC is required to accede to certain State-related financial procedures, including that the College: "is required to adopt the State's accounting system," to "follow the marquee accounting document submission deadlines," and "file agency banking reports with the State Treasurer." (*Id.* (citations omitted)) However, Defendants fail to explain how DTCC's accession to these procedural requirements speak to how the State "retains ownership or control of funds appropriated to" DTCC. *Febres*, 445 F.3d at 234.

Second, Defendants explain that DTCC "is required to . . . submit financial documentation regarding all relevant transactions and purchase orders to the [State Department of Finance ('DOF')] for approval and year-end budgetary consideration." (D.I. 43 at 11 (citing *id.*, ex. Y); *see also* Tr. at 16 (Defendants' counsel stating that "if there were a settlement or some other reason why we would be paying money to resolve this litigation, [DTCC] would have

---

[20]     If the facts relating to the degree of the state's control over an entity's funds do not demonstrate state ownership of the funds in question, those facts may still have relevance to the third *Fitchik* factor regarding autonomy. *Christy*, 54 F.3d at 1146.

to issue a purchase order to the State of Delaware Treasurer to authorize the check to be issued"))
In support, Defendants cite to a July 2010 State Executive Department Office of Management
and Budget Memorandum, directed generally to "Fiscal Officers[;]" this memorandum purports
to "define the procedures to be utilized by agencies in preparing and processing purchase orders
and requisitions[.]" (D.I. 43, ex. Y) The memorandum notes that "[a]gencies are prohibited
from creating any indebtedness or incurring any obligation for personal services, work or labor or
for property, materials or supplies except by written, printed or electronic requisition or order."
(*Id.*) Yet there is nothing else in the record to provide any additional context regarding this
memorandum, such as whether it in fact applies to DTCC, and, even if it does, whether the
memorandum's requirements would apply to DTCC's expenditure of funds to satisfy a *legal
judgment* in this case. Without any such context, the Court cannot conclude from the text of the
memorandum alone that, as to payment of any judgment here, DTCC would have to (1) submit a
purchase order to the DOF and (2) obtain approval from DOF in order to make payment.

Third, Defendants similarly contend that DTCC "cannot engage in any transaction or
payment without the express consent of the State. Without State approval, the College does not
have the power to disburse monies appropriated by the legislature nor monies collected from
other outside sources. . . . all funds . . . are deposited into accounts controlled by the State[.]"
(D.I. 47 at 6 (citing D.I. 48, ex. Q); *see also* D.I. 43 at 11 ("To further protect State assets, the
College must seek certification from the State Treasurer in order to conduct transactions" and
"maintains jointly held bank accounts with the State of Delaware") (citing D.I. 43, ex. Z)) In
support, Defendants cite to a "Certification of State of Delaware Acting Director of Treasury
Service" and a "Resolution to Sign Negotiable Instruments"—documents relating to several

26

DTCC accounts at PNC Bank. Those documents reveal that "only the [State] Treasurer has the authority to open and close accounts" on behalf of DTCC—but they then go on to provide *DTCC employees* with the authority to, *inter alia*, sign checks and other negotiable instruments (*without* requiring them to get State approval each time they do so). (D.I. 43, ex. Z; D.I. 48, ex. Q at D1266; *see also* Tr. at 14 (Defendants' counsel acknowledging that these documents amount to "a resolution allowing the College to sign negotiable instruments"); *id.* at 15-17) Thus, if anything, these documents seem to suggest the opposite of what Defendants have alleged—that DTCC does not have to seek State approval before engaging in any particular financial transaction, such as deciding whether or not to make payment on a judgment in this case.[21]

Fourth, Defendants claim that "all [DTCC] funds . . . [are] considered State assets." (D.I. 47 at 6 (citing D.I. 48, ex. S)) In support, Defendants cite to a DOF memorandum titled "Annual Capital Assets Inventory" directed generally to "[a]ll Department [of Finance] and School Fiscal Officers"; the memorandum explains that reporting an inventory of capital assets (i.e., land, buildings) to the State is necessary "to maintain an unqualified audit opinion, which directly impacts the State's Bond rating." (D.I. 48, ex. S) However, Defendants provide no further context as to how this inventory requirement relating to capital assets indicates how DTCC's funds are "considered State assets" or how that should affect the key ownership-of-funds inquiry at issue here.[22]

---

[21]     At oral argument, Defendants' counsel was unable to cite to a portion of these documents that supports the statements made in Defendants' briefs. (*See* Tr. at 31-33)

[22]     During oral argument, Defendants' counsel also asserted that "technically" the State Treasurer could "come[] in and when it wants to just take[] money out of [DTCC's bank accounts] and pay[] off other debt[,]" though counsel noted that Defendants do not believe that the State "ever would" or ever has done this. (Tr. at 145) If DTCC funds could be re-

27

Fifth, Defendants contend that: (1) the "liabilities of the College are considered liabilities of the State for audit purposes"; (2) therefore "an adverse judgment would be treated as a State liability"; and (3) "[a]ny relevant insurance policy is purchased using funds controlled by the State; and, for that matter, any item purchased is done so with monies that the State considers its own." (D.I. 47 at 6 (citing D.I. 48, ex. T)) In support of all of these assertions, Defendants cite only to a DTCC document entitled "Financial Information Delaware Technical Community College[.]" (*Id.*) This document does state that DTCC "is a State of Delaware agency; therefore, the College's audits are included with those of all state agencies." (D.I. 48, ex. T) But when asked during oral argument how this document otherwise supports the assertions above, Defendants' counsel responded: "[W]hat this means is that when the State auditor comes in and audits all of the State agencies, including [DTCC], it includes the College's assets and liabilities among the global assets and liabilities of the State of Delaware on that one report." (Tr. at 18-19) Had the text of the cited one-page document more clearly stated or suggested that "the College's assets and liabilities [are included] among the global assets and liabilities of the State of Delaware" the document would be more persuasive. Yet the language used in the document is vague. And in the absence of further evidence of record (and thus, further clarity) on this point, the Court cannot conclude that the exhibit speaks persuasively to the issue of State ownership of DTCC's funds. *Cf. Nat'l R.R. Passenger Corp. v. Com. of Pa. Public Util. Comm'n*, No. CIV.

---

appropriated by the State, such a fact would be relevant to the ownership of funds inquiry discussed in this sub-section. *Cf. Mitchell v. L.A. Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988) (granting Eleventh Amendment immunity to defendant Los Angeles Community College District where that district's "budget is made up of funds received from the state's general fund pursuant to a state calculated formula" and some fees charged by the district's colleges "go to the [S]tate"). However, no such evidence is of record.

28

A. 86-5357, 1997 WL 597963, at *7 (E.D. Pa. Sept. 15, 1997) (noting that a state's "authority to review and approve [a state] [c]ommission's budget" fell short of indicating "state ownership of the funds").

And sixth, at oral argument, the Court requested that Defendants identify "the best piece of record evidence that substantiates that" if DTCC wishes to purchase something or otherwise spend money, it must get State approval for each specific request. (Tr. at 29) Defendants' counsel ultimately pointed to a memorandum from the DOF to "[a]ll Department and School Fiscal Officers" enclosing a "Tax Exempt Certificate" form for the State of Delaware. (*Id.* at 139 (citing D.I. 43, ex. BB)) The memorandum explains that the Certificate should be provided to vendors upon request. (D.I. 43, ex. BB) The Certificate states that:

> In accordance with Internal Revenue Code Section 4253(1), no tax shall be imposed under Section 4251 upon any payment received for services or facilities furnished to the government of any State . . . . This certifies that such exemption is allowable by law for the reason that such services are being and will be furnished to and charges will be paid from the funds of the State of Delaware.

(*Id.*) This document is focused solely on payments for a very particularized group of "services": certain "communications services."[23] It could be interpreted to mean that any time DTCC pays for these particular services, the State considers such payment as being paid from the State's "funds[.]" However, it does not support the idea that DTCC must get State approval before

---

[23]    Internal Revenue Code Section 4251 imposes a tax "on amounts paid for communications services[,]" which is defined as "(A) local telephone service; (B) toll telephone service; and (C) teletypewriter exchange service." 26 U.S.C. § 4251. Internal Revenue Code Section 4253 establishes several exemptions to this tax, including an exemption for state and local governments, and subsection (1) requires persons claiming such an exemption to "provide to the provider of communications services a statement . . . certifying that such person is entitled to such exemption." 26 U.S.C. §§ 4253(a)-(1).

entering into any such transaction. And perhaps more importantly, the document does not indicate that the State Treasurer would exercise ownership or control over funds used to pay a *judgment* in this lawsuit. Indeed, none of Defendants' proffered evidence clearly demonstrates this, nor have Defendants furnished affidavits that would bear this out. *See, e.g., Nannay v. Rowan Coll.*, 101 F. Supp. 2d 272, 284 (D.N.J. 2000) (applying the *Fitchik* factors to conclude that the defendant college was entitled to Eleventh Amendment immunity where the State defendants submitted, *inter alia*, "an affidavit from the Vice President of Administration and Finance of Rowan University to the effect that any judgment rendered against Rowan University would be paid directly from the State treasury through the State Tort Claims Fund . . . . [and] also stat[ing] that Rowan University has set aside no funds to meet its liabilities for injury and damages claims, such as those asserted in this lawsuit") (citation omitted).

In sum, Defendants have failed to sufficiently demonstrate that payment will come from the State's treasury, that is, that any funds used to pay the judgment are State-owned funds.

### b. Whether DTCC has the money to satisfy the judgment

As to the second sub-factor, Defendants have not pointed to record evidence suggesting that DTCC does not have the money to satisfy a judgment. *See Christy*, 54 F.3d at 1146 (stating that "the [agency's] failure to provide pertinent information regarding its ability, or lack thereof, to satisfy a potential judgment against it simply means that the [agency] has failed to sustain its burden of proof on this important question"). As noted above, the record evidence suggests that DTCC has a budget, or a pool of funding, derived in part from State-provided funds and in part from other monies. The record indicates that DTCC utilizes those budgeted monies to pay for its various expenditures (payments that Defendants have been unable to establish are controlled or

30

directed by the State).

Beyond that, it is worth noting that there is also some record evidence that any judgment may actually be paid not by DTCC directly, but instead in part or in whole by an insurance company. As Plaintiff explains, (D.I. 44 at 15 (citing D.I. 46 at A088)), in their initial disclosures, Defendants made reference to the existence of an insurance policy that is relevant to the claims at issue. Defendants did so by citing to Federal Rule of Civil Procedure 26(a)(1)(A)(iv)—an acknowledgment that the insurance policy in question "may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment." Fed. R. Civ. P. 26(a)(1)(A)(iv). During discovery, Defendants in fact produced a copy of this insurance policy, one that has a limit of $1 million per loss, and that appears to cover both DTCC and its employees. (D.I. 44 at 15 (citing D.I. 46 at A089-99)) It follows that it is at least possible that monies used to satisfy the judgment could come from this insurer. (*See* Tr. at 77-80) And there is no indication in the record that the State (as opposed to DTCC) pays the premiums to fund that insurance policy. (Tr. at 26-28, 84); *cf. Fitchik*, 873 F.2d at 661 (noting that where an entity was self-insured, in a manner that would allow it to pay some of the claims against it with money it has set aside to cover such liabilities, this suggests the entity "need not ask the state or anyone else for help").

### c. Whether the State has immunized itself from responsibility for DTCC's debts

As for the third sub-factor—whether the State has immunized itself from responsibility for DTCC's debts—it appears undisputed that the State has not taken this step. (D.I. 43 at 12)[24]

---

[24] Though again, this is an area where an affidavit or some other similar record evidence would have helped to confirm this point.

31

It is worth remembering, however, that the key question with regard to the first *Fitchik* factor is whether DTCC has established that the State is "under any affirmative obligation to pay [DTCC's] unassumed liabilities in the first place." *Christy*, 54 F.3d at 1147.

In speaking to this "affirmative obligation" issue, Defendants argue that "the State considers the College to be a component of primary government." (D.I. 43 at 12) DTCC's enabling statute provides that DTCC "'shall be a state agency,'" Defendants explain, and as such, DTCC "is subject to the prohibition contained in Article VIII, Section 3 of the Delaware Constitution that provides, in relevant part, 'no money shall be borrowed or debt created by or on behalf of the State but pursuant to an Act of the General Assembly.'" (*Id.* (quoting Del. Code tit. 14, § 9102 & Del. Const. art. VIII, § 3); *see also* D.I. 47 at 6) Again, here the invoking of this provision of the State Constitution, without more, just does not speak directly enough to the issue in question—if DTCC had to pay a judgment and could not, would the State consider itself to be under an affirmative obligation to pay that debt? If the State does in fact feel that it would be under such an obligation, there must have been myriad ways that this could have been made clearer on the record here. But it was not.

### d. Conclusion

In *Miller I*, with regard to the first *Fitchik* factor, the Court concluded that on the record before it, "DTCC has failed to establish that: (1) payment for a judgment against DTCC will come from the State's treasury (as opposed to funds controlled by DTCC itself); (2) DTCC lacks financial resources to satisfy any judgment; and (3) Delaware would be under any obligation to satisfy any such judgment against DTCC." *Miller I*, 2013 WL 1832072, at *9. The present record has not meaningfully changed. What evidence there is suggests that DTCC's funds that

32

would be used to pay a judgment are kept in a DTCC-segregated account, are under the control of DTCC employees, and that those monies are used at DTCC's discretion to carry out the school's educational purposes. *See Lang*, 2015 WL 1787050, at *2. Defendants have provided insufficient evidence to support the conclusion that the monies used to pay a judgment here would come from the State, or that the State is in any way legally obligated to pay such a judgment. In the end, the Court cannot rely on Defendants' insufficiently supported assertions to the contrary. *Cf. Griner v. Se. Cmty. Coll.*, 95 F. Supp. 2d 1054, 1059, 1062 (D. Neb. 2000) (declining to extend Eleventh Amendment immunity to community college where, *inter alia*, "[t]here is neither evidentiary nor statutory evidence that the state of Nebraska would necessarily be liable for payment of a judgment rendered against [the college] in this case"). Based on the evidence before the Court, the first *Fitchik* factor continues to weigh squarely in Plaintiff's favor.

## 2. DTCC's Status under State Law

The second *Fitchik* factor involves a determination of the agency's status under state law. This factor requires the Court to consider "how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation[.]" *Fitchik*, 873 F.2d at 659. In *Miller I*, the Court found that only certain of these sub-factors were addressed in the record. As to the sub-factors that were addressed, though they "d[id] not all point clearly in one direction[,]" those that were "before the Court with sufficient clarity . . . weigh[ed] slightly in favor of a finding of immunity[.]" *Miller I*, 2013 WL 1832072, at *10.

Defendants now address two of the sub-factors that were unaddressed in *Miller I*: DTCC's incorporation and whether DTCC is immune from state taxation. *Id*. Defendants assert

that the evidence they have put forward establishes that "the College has not been accorded a separate corporate existence" and that it "has the same tax identification number as the State of Delaware" such that it is "immune from state and federal income tax." (D.I. 43 at 12-13 & n.97 (citing D.I. 43, ex. BB); D.I. 47 at 7 (citing D.I. 48, ex. U); Tr. at 94) To support these statements, Defendants cite exclusively to the memorandum from the DOF to "[a]ll Department and School Fiscal Officers" enclosing the "Tax Exempt Certificate" referenced above. These documents, on their face, indicate only that the Departments and Schools that received the documents are exempt from paying taxes on certain communications services; they do not clearly state that DTCC has "no separate corporate existence" and that it has the "same tax identification number as the State." While the documents hint that Defendants' assertions may be correct, again, this is an area where fuller record evidence would have been helpful.

As to the sub-factor addressing how state law treats the agency generally, in *Miller I*, the majority of the evidence put forward weighed in favor of immunity. *Miller I*, 2013 WL 1832072, at *10 (noting that DTCC is listed as a state agency in State materials and in State law, and that State law also refers to DTCC employees as State employees). Defendants now further supplement the record by pointing out that DTCC's Board of Trustees has been empowered to exercise the power of eminent domain, (D.I. 47 at 7 & n.84), a fact cited in other cases as providing indication that a state considers an entity an arm of the state. *Fitchik*, 873 F.2d at 663 (noting, however, that such power "does not mean that [the entity] is necessarily entitled to [E]leventh [A]mendment immunity" since counties, municipalities, and privately owned public utilities also held the eminent domain power).

The remaining sub-factor is whether an entity can sue or be sued in its own right. This

34

sub-factor redounds in Plaintiff's favor, as DTCC can sue and be sued pursuant to State law. *Miller I*, 2013 WL 1832072, at \*10 (citing Del. Code tit. 14, § 9105(d)(4)).

In sum, since *Miller I*—where the record as to this second *Fitchik* factor was such that the Court could only conclude that the evidence weighed "slightly" in favor of a finding of immunity—Defendants have added to that record. The additional evidence Defendants have provided certainly could have been fuller or more clear in places. But taken together, it suggests that, in the main, the State's law looks at DTCC as being closely connected to the State. Thus, the Court concludes that the record now demonstrates that this *Fitchik* factor should squarely favor a finding of immunity.

### 3.  DTCC's Autonomy

The third and final *Fitchik* factor requires the Court to determine what degree of autonomy the entity has. *Fitchik*, 873 F.2d at 659. In *Miller I*, the Court explained that while the composition of DTCC's Board of Trustees ("Board") is controlled by Delaware's Governor, and while State law provided certain financial constraints under which DTCC must function, DTCC also has the ability to act independently in a great many ways. *Miller I*, 2013 WL 1832072, at \*11. These included that DTCC has the ability to freely contract, to sue, to buy and sell land, to hire employees and fix their salaries and terms of employment and to make its own rules and regulations. *Id.* Accordingly, the Court concluded that this factor weighed "slightly against a finding of immunity." *Id.* at \*11-12 (citing cases).

Here, Defendants reiterate several facts that were addressed in the briefing on their Motion to Dismiss, such as: (1) the fact that the Governor appoints the members of DTCC's Board and sets the Board's compensation, terms and qualifications; (2) the State requirement that

35

DTCC provide financial aid to needy students, and (3) the State's establishment of the salary scale applicable to DTCC employees. (D.I. 43 at 14-15); *see Miller I*, 2013 WL 1832072, at *10-11. Defendants also put forward new allegations meant to demonstrate DTCC's lack of autonomy, including that: (1) the State determines DTCC's "purpose and object"; (2) DTCC is not authorized to "borrow money in its own name or to raise funds through issuance of bonds"; (3) DTCC has "no authority to create employment positions" but is required to receive approval from the State; (4) DTCC needs State approval if it uses State funds for course materials; (5) DTCC is audited annually by the State; (6) the State Treasurer must certify all DTCC banking transactions; and (7) DTCC is required to use the State credit card operations and State credit card merchants. (D.I. 43 at 14-16)

Yet again, some of these new assertions are not clearly supported by the record. For example:

- Defendants' citation in support of the allegation that DTCC cannot borrow money in its own name or raise funds through the issuance of bonds is to DTCC's enabling statute. (*Id.* at 14 n.112 (citing Del. Code tit. 14, § 9105)) While the enabling statute may not expressly grant DTCC the power to borrow money and raise funds through the issuance of bonds, that does not in and of itself mean that DTCC *cannot* do these things. The Court notes that the enabling statute does give DTCC the power to accept, from any source, "grants or contributions of money or property (conditional or otherwise) which the Board may use for or in aid of any of its purposes[,]" the power to "enter into contracts" and the power to "exercise all other powers not inconsistent with" the enabling statute that may be "reasonably necessary" to operate the College. Del. Code. tit. 14, §§ 9105(d)(10), (11) & (15). At a minimum, the text of the enabling statute does not clearly demonstrate that DTCC is without power to borrow money or raise funds through the issuance of bonds. If anything (and without further context provided by Defendants), the above-cited portions of the enabling statute suggest that such powers would not be "inconsistent" with DTCC's enumerated

36

powers and would be "reasonably necessary" to operate the school.

- The cited evidence does not clearly demonstrate that DTCC lacks the "authority to create employment positions." The only documents cited in support of this statement are a 2013 e-mail string and memorandum. (D.I. 43 at 15 n.115-16) These documents indicate that in 2013, the State approved the College's request for over two million dollars in federal funds for a redesign of DTCC's Nursing Program—a proposal that appears to have included a request to fund 14 new employment positions. (*Id.*, exs. DD & EE) In other words, at most, this evidence relates to one very particularized instance in which State approval to fund certain employment positions was obtained. It comes nowhere close to supporting the blanket assertion that State approval is necessary for the creation of any DTCC employment position. (*Id.*)[25]

- As for course material approval, the cited record evidence only demonstrates that "any used equipment purchase over $10,000" requires State approval. (*Id.*, ex. FF)

- And, as discussed above, the record does not bear out that the State has to "certify" all banking transactions—rather, the cited document grants authority to DTCC employees to conduct such transactions. (D.I. 43 at 15 & n.118 (citing *id.*, ex. AA))

That leaves the assertions that: (1) the State establishes DTCC's overall "purpose and object"; and (2) and DTCC is subject to state audits and is required to use the State credit card operations and its merchants. As to the former, it is true that, pursuant to Del. Code tit. 14, § 9104, the State has set out the College's "purpose": "to operate or make available public institutions of learning for persons who have graduated from high school or who are unable to attend public high schools." However, the Court cannot reasonably infer that the State's

---

[25]     Meanwhile, it is worth noting that DTCC's enabling statute grants the Board the power to "appoint or employ such other officers of the institutions, agents and employees as may be required to carry out this chapter and to fix and determine their qualifications, duties, compensation, terms of office or employment and all other terms and conditions of employment[.]" Del. Code tit. 14, § 9105(d)(7).

articulation of this kind of broad, overarching goal is an act that itself causes significant interference with DTCC's day-to-day activities, especially where DTCC's enabling statute gives its Board the right to "determine the educational program of the institutions[.]" Del. Code tit. 14, § 9105(d)(5); *see also Miller I*, 2013 WL 1832072, at *11 (noting that whether the entity at issue exercised significant autonomy in its day-to-day operations is important to the calculus here) (citing cases). As to the latter, the State does annually audit DTCC, (D.I. 43 at 15 (citing *id.*, ex. GG)), and this does suggest some limits on the College's autonomy. *See Lang*, 2015 WL 1787050, at *2; *see also Skehan v. State Sys. of Higher Educ.*, 815 F.2d 244, 248 (3d Cir. 1987). So too does the fact that DTCC uses the State's credit card operations. (D.I. 43 at 16 n.119 (citing *id.*, ex. HH))

Summing up, Defendants' showing with respect to this *Fitchik* factor is not much changed from what it was at the Motion to Dismiss stage. It is clear that the State does exert some operational and financial constraints under which DTCC must operate. But as Plaintiff stresses, (D.I. 44 at 17; *see also Miller I*, 2013 WL 1832072, at *11), DTCC also possesses the many significant powers listed above. These powers give DTCC a real "measure of autonomy" and the ability to take many important steps without threat of veto by the Governor or the need to seek the legislature's prior approval. *Cooper*, 548 F.3d at 300; *see also Bolden v. Se. Pa. Transp. Auth.*, 953 F.2d 807, 820 (3d Cir. 1991) (noting that the fact that an entity's actions are "not subject to gubernatorial veto" was a factor suggesting the entity's autonomy).

The evidence (and the case law) suggest that the decision as to this factor is a close call. *See, e.g., Lang*, 2015 WL 1787050, at *2-3 (finding, at the motion to dismiss stage, that the autonomy question was "close[,]" but that the evidence did not "weigh in favor of immunity"

38

where the entity in question was controlled by a fairly autonomous board that had the ability to freely take many types of independent actions, but where the board was composed entirely of individuals chosen by state officials, and where the entity was required to submit to certain state procedural requirements); *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1351-52 (3d Cir. 1994) (finding the factor to weigh "slightly" in favor of according immunity, where the entity maintained the ability to take many important actions on its own, and had its own corporate existence, but where its board was entirely made up of state appointees). In the end, the Court concludes that the significant powers that DTCC's Board may exercise, combined with the lack of any State veto power over the Board's decision-making authority, is enough to indicate that this factor should continue to lean slightly in Plaintiff's favor or, at most, be neutral. *Cf. Kuhn*, 2011 WL 1576691, at *6 (finding that the autonomy factor weighed against immunity, although the board of the entity in question was controlled exclusively by the State in terms of composition and method of appointment, because the entity, through its enabling statute, was able to adopt its own by-laws, engage personnel, enter into contracts in its own name, borrow funds in its own name, and purchase and develop property, all free of threat of gubernatorial veto).

### 4. Weighing of *Fitchik* Factors

Having considered each of the three *Fitchik* factors, the Court concludes that Defendants have failed to meet their burden to show that DTCC is an arm of the state that is subject to immunity under the Eleventh Amendment. While the second factor, DTCC's status under State law, weighs in favor of immunity, the first factor, the source of the money for a judgment, weighs against that conclusion. And the third factor, regarding the entity's autonomy, either weighs

39

slightly against a finding of immunity or is, at most, neutral. To be sure, this is a close case. But even "in close cases, where 'indicators of immunity point in different directions,'" the "'prime guide'" for a Court should be whether the money for a judgment will be paid out of the State's treasury. *Febres*, 445 F.3d at 229–30 (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47-48, 52 (1994)). And here, as noted above, that factor redounds in Plaintiff's favor.

The Court also notes that the issue was close enough that had each of Defendants' assertions in their briefing been adequately supported by the record, the outcome might have been different. Yet although this was Defendants' second opportunity to make a clear and specific record on the question of sovereign immunity, the evidentiary support for their statements was often wanting. And so, for the reasons set out above, the Court's ultimate recommendation as to this issue must remain unchanged.

### B. Sufficiency of Evidence

Plaintiff asserts that Defendants' choice to award the 2010 Contract to Outdoor was discriminatory. He claims that Defendants thus violated his rights under 42 U.S.C. § 1981 ("Section 1981") and deprived him of equal protection of the law as guaranteed by the Fourteenth Amendment, in violation of 42 U.S.C. § 1983 ("Section 1983"). (D.I. 1) Defendants respond that Plaintiff failed to establish sufficient evidence to make out these claims. (D.I. 43 at 16-20; D.I. 47 at 8-10) For the reasons discussed below, the Court disagrees with Defendants and recommends denial of the Motion on these grounds.

Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981. Section 1983 provides

a remedy for deprivations of rights established elsewhere in the Constitution or federal laws. *Estate of Smith v. Marasco*, 318 F.3d 497, 505 (3d Cir. 2003). In order to prevail under both statutes, the plaintiff must prove "purposeful discrimination." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 268 (3d Cir. 2010) (stating that "[t]he burden of a [Section] 1981 plaintiff is to prove purposeful discrimination") (internal quotation marks and citation omitted); *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009) ("To bring a successful claim under [Section] 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination.") (internal quotation marks and citation omitted).

In the absence of direct evidence of discrimination, a plaintiff may prove race discrimination through the familiar burden-shifting analysis developed by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Anderson*, 621 F.3d at 270; *Smith v. Walgreen Co.*, 964 F. Supp. 2d 338, 344 (D. Del. 2013). This burden-shifting framework applies to both Plaintiff's Section 1981 and 1983 claims, and the Court will therefore consider them together. *McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 825 n.3 (3d Cir. 1994); *Chandler v. City of Newark*, No. CIV. A. 99-668-GMS, 2001 WL 902209, at *3 (D. Del. July 31, 2001).

Under the *McDonnell Douglas* framework: (1) a plaintiff must first set forth sufficient evidence to establish a *prima facie* case of race discrimination; (2) the defendant must then set forth a legitimate non-discriminatory reason for its actions; and, if it does (3) the plaintiff must then raise a material factual dispute regarding whether the defendant's proffered reasons were a pretext for discrimination. *Ugorji v. N.J. Envtl. Infrastructure Trust*, 529 F. App'x 145, 150-51

(3d Cir. 2013); *Anderson*, 621 F.3d at 270-71.

### 1. Plaintiff's *Prima Facie* Case

To establish a *prima facie* case in this context, a plaintiff must show that: "(1) [he] is a member of a protected class; (2) [he] submitted an application or bid which met the requirements for an available contract; (3) [his] application or bid was ultimately rejected; and (4) the contract was ultimately awarded to an individual who is not a member of a protected class." *Allstate Transp. Co., Inc. v. Se. Pa. Transp. Auth.*, No. CIV. A. 97-1482, 2000 WL 329015, at \*7-8 (E.D. Pa. Mar. 27, 2000) (adopting the *prima facie* standard set out for public bidding cases in *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991)).[26] A plaintiff must establish his *prima facie* case by a preponderance of the evidence. *Smith*, 964 F. Supp. 2d at 344.

In their briefing, Defendants do not challenge the first three elements of Plaintiff's *prima facie* case (that Plaintiff is an African-American, submitted an appropriate bid, and had that bid rejected). They argue, however, that Plaintiff did not sufficiently establish the fourth element.

---

[26]     The Third Circuit has not yet had occasion to determine the proper elements of a *prima facie* case in the public bidding context. In such cases, other courts have modified the *McDonnell Douglas* framework for a *prima facie* case, using two different formulations. One is the standard set out by the United States Court of Appeals for the Eleventh Circuit in *Brown v. Am. Honda Motor Co.*, 939 F.2d 946 (11th Cir. 1991), articulated above. Another is that set by the United States Court of Appeals for the First Circuit, which established a more rigorous standard in *T & S Serv. Assoc., Inc. v. Crenson*, 666 F.2d 722, 725 (1st Cir. 1981). Specifically, the *T & S Serv.* Court required the plaintiff to show that: (1) the plaintiff is a minority-owned firm; (2) the plaintiff's bid met the specifications required of those competing for the contract; (3) the plaintiff's bid was significantly more advantageous to the defendant than the bid actually awarded; and (4) the defendant selected another contractor. *T & S Serv.*, 666 F.2d at 725. Here, the Court agrees with the *Allstate* decision, cited above, in finding that the "*Brown* elements represent the appropriate standard" as "[t]he rigorous *T & S* standard is not consistent with the spirit of the *McDonnell Douglas* structure in which the presentation of a prima facie case presents only a light evidentiary hurdle for the plaintiff." *Allstate*, 2000 WL 329015, at \*7. And indeed, both parties here have pointed to the *Brown* standard as the appropriate framework to use. (*See* D.I. 44 at 18; D.I. 47 at 8; Tr. at 61)

(D.I. 47 at 8; Tr. at 61-66; *see also* D.I. 43 at 20) That is, Defendants contend that Plaintiff has

"submit[ted] nothing more than guesswork" regarding the racial status of Outdoor's ownership.

(D.I. 47 at 8)

    With respect to this element, Plaintiff states that at the time DTCC awarded the 2010

Contract to Outdoor, Outdoor's "owner and president was Jeffrey Thompson, a Caucasian."

(D.I. 44 at 3) In support, Plaintiff primarily points to the following testimonial evidence of

record, (*id.*):

(1)    Plaintiff's testimony, (D.I. 46 at A334):

| Counsel: | Who is the owner of Outdoor Design? |
|---|---|
| Plaintiff: | I believe that's Mr. Jeffrey Thompson, who is Caucasian. |

(2)    Defendant Faucett's testimony, (*id.* at A374-75, A378.1):

| Counsel: | And at that time [April 2010], Outdoor Design Group's owner and president was Jeffrey Thompson; is that correct? |
|---|---|
| Faucett: | That's my recollection, yes. |
| Counsel: | And isn't it true that Jeffrey Thompson is a Caucasian? |
| Faucett: | That's my recollection, yes. . . . |
| Counsel: | You told us that [at the time the 2010 Contract was awarded] your recollection is the owner was Jeffrey Thompson, correct? |
| Faucett: | Correct. |
| Counsel: | So isn't it true that the 2010 to 2013 contract ultimately was awarded to a non-African-American? |
| Faucett: | Correct. |

(3)    Defendant Schirmer's testimony, (*id.* at A481-82):

| Counsel: | And whose names are under "Outdoor Design"? |
|---|---|
| Schirmer: | Looks like Jeff and Rick. |
| Counsel: | And who's Jeff? |
| Schirmer: | I'm not sure what his title is or who he is. |

43

| | |
|---|---|
| Counsel: | Was that Jeff Thompson? |
| Schirmer: | Don't know. |
| Counsel: | Who is "Rick"? |
| Schirmer: | Well, I'm assuming that's Rich Crouse. |
| Counsel: | What is your understanding of his role at Outdoor Design? |
| Schirmer: | One of the owners. |
| Counsel: | Jeff is a Caucasian male; is that correct? |
| Schirmer: | Yes, again, he looks Caucasian. I don't know his family tree, either, so . . . |
| Counsel: | Rick Crouse looks Caucasian as well? |
| Schirmer: | The same thing . . . . The same answer; he looks to be Caucasian, but don't know his family tree. I do not know. |

This testimony above supports the inference that Outdoor was owned by Mr. Thompson and/or Mr. Crouse, and that both men are Caucasian.[27] Two pieces of documentary evidence further bolster that conclusion. The first is the 2010 Contract itself, in which a "Vendor" signature line titled "Jeffrey L. Thompson, President" is struck through, and the document is signed instead for Outdoor by Mr. Crouse, who lists his title as "Member[.]" (D.I. 46 at A166) The second is a set of handwritten notes of the pre-selection interview with Outdoor, in which Outdoor is listed as being represented by "Jeff & Rick" (which appears to be a reference to Mr. Thompson and Mr. Crouse). (*Id.* at A167)[28]

"The burden of establishing a prima facie case 'is not intended to be onerous.'"

---

[27]     It is true that during Defendant Faucett's deposition, Defendants' counsel told him that Outdoor was a limited liability company and established that Defendant Faucett did not understand the ownership structure of such a company, such that Defendant Faucett therefore did not "have any way of knowing who the actual owners of Outdoor [are]." (D.I. 48, ex. C at 154; *see also* D.I. 47 at 1 & n.6) But that does not change Defendant Faucett's previous testimony that, based on the information he had prior to the deposition, he believed Outdoor's owner to be Mr. Thompson.

[28]     For their part, Defendants have not pointed to any record evidence suggesting that there were, in fact, other Outdoor owners or that any such persons may have been non-Caucasian.

*Romdhani v. Exxon Mobil Corp.*, Civil Action No. 07-715-JJF, 2011 WL 722849, at *12 (D. Del. Feb. 23, 2011) (quoting *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995)). In the end, the Court is unconvinced that Plaintiff need make a more robust showing than he has as to the fourth element. The best record evidence is that Outdoor had one, or perhaps two owners in 2010, and that both were of a race outside of the protected class. Viewing the evidence in the light most favorable to Plaintiff, as it must at this stage, the Court finds that Plaintiff has sufficiently established each element of his *prima facie* case of racial discrimination.

### 2. Defendant's Legitimate, Non-Discriminatory Reason

Under *McDonnell Douglas*, the burden next shifts to Defendants. *McDonnell Douglas*, 411 U.S. at 802. This "relatively light burden" is satisfied by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for their unfavorable action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994); *see also Luta v. Delaware*, 847 F. Supp. 2d 683, 687 (D. Del. 2012). The Defendants "need not prove that the tendered reason *actually* motivated [their] behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes*, 32 F.3d at 763.

Here, Defendants explain that DTCC "had countless, nondiscriminatory reasons for awarding the 2010 Contract to Outdoor[,]" (D.I. 43 at 19), and proceed to list no fewer than 23 such reasons, (D.I. 47 at 9-10). These reasons include just about any problem that any Individual Defendant (or Dr. Smith) had with Plaintiff's prior work during the 2007 Contract term, and just about any deficiency any Individual Defendant saw in Plaintiff's 2010 Contract bid (as compared to Outdoor's bid). (*Id.*)

45

For purposes of this Motion, at least, both parties agree that these 23 "reasons" may be grouped into five broad categories (the "five categories"): (1) Outdoor's bid was superior and contained all necessary components; (2) Outdoor bid a more competitive price; (3) Outdoor's interview presentation was very good; (4) Plaintiff demonstrated a pattern of argumentative and difficult behavior; and (5) Plaintiff demonstrated poor performance under the 2007 Contract and an inability to maintain the Campus as a "showplace." (D.I. 44 at 3; Tr. at 117; *see also* Tr. at 146-47); *see also Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 282-83 (3d Cir. 2001) (analyzing a host of proffered legitimate, non-discriminatory reasons by grouping them into "two categories"). These five categories certainly constitute legitimate and non-discriminatory reasons for the award of the 2010 Contract to Outdoor instead of Plaintiff. And Plaintiff does not appear to dispute that this step of the *McDonnell Douglas* test has been satisfied. (*See* D.I. 44 at 3, 18-19 (setting out Defendants' explanations for their adverse action and thereafter proceeding to the pretext inquiry)) Accordingly, Defendants have met their burden here.

### 3. Pretext

Because Defendants have satisfied their burden of production, the burden shifts back to Plaintiff to establish, by a preponderance of the evidence, that Defendants' reasons for their actions are pretext for discrimination. *Fuentes*, 32 F.3d at 763. In order to show pretext, Plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764. In this Circuit, this two-pronged test is known as the

46

*Fuentes* test. *Luta*, 847 F. Supp. 2d at 688.

Under prong one of the *Fuentes* test:

> [T]he plaintiff cannot simply show that the [defendant's] decision
> was wrong or mistaken, since the factual dispute at issue is whether
> discriminatory animus motivated the [defendant], not whether the
> [defendant] is wise, shrewd, prudent, or competent. . . . Rather, the
> non-moving plaintiff must demonstrate such weaknesses,
> implausibilities, inconsistencies, incoherencies, or contradictions in
> the [defendant's] proffered legitimate reasons for its action that a
> reasonable factfinder *could* rationally find them unworthy of
> credence . . . and hence infer that the [defendant] did not act for the
> asserted non-discriminatory reasons.

*Fuentes*, 32 F.3d at 765 (internal quotation marks, brackets and citations omitted) (emphasis in

original); *see also Luta*, 847 F. Supp. 2d at 688. In other words, "a plaintiff may satisfy this

standard by demonstrating, through admissible evidence, that the [defendant's] reason was not

merely wrong, but that it was 'so plainly wrong that it cannot have been the [defendant's] real

reason.'" *Jones*, 198 F.3d at 413 (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101,

1109 (3d Cir. 1997)); *see also Luta*, 847 F. Supp. 2d at 688. Cases analyzed under this prong

survive summary judgment "when the [defendant's] stated reason for termination is so

implausible that a reasonable fact-finder could not believe it." *Luta*, 847 F. Supp. 2d at 688

(internal quotation marks and citation omitted).

In a case such as this one, where the defendant has presented a "bagful of legitimate

reasons," a plaintiff is not required to offer evidence to discredit every one of those reasons;

instead he must "cast substantial doubt on a fair number of them[.]" *Fuentes*, 32 F.3d at 764 n.7;

*see also Tomasso v. Boeing Co.*, 445 F.3d 702, 707 (3d Cir. 2006); (D.I. 44 at 18 n.68; Tr. at 69

(Defendants' counsel agreeing that this is the proper form of analysis)). This is because

47

discrediting a "fair number" of the movant's explanations "may impede the [defendant's] credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available." *Fuentes*, 32 F.3d at 764 n.7.

Here, the Court concludes that Plaintiff has cast substantial doubt on four of Defendants' five categories of legitimate reasons (all but the quality of Outdoor's interview presentation). The Court will discuss its conclusion as to these four categories in more detail below.

### a. Outdoor's bid was superior and contained all necessary components

Among their "bagful" of reasons, Defendants proffer that "Outdoor submitted a far superior bid package . . . . [that] without any legitimate dispute [] contained all necessary components." (D.I. 43 at 19) Plaintiff responds by arguing that Outdoor "did not . . . meet the minimum qualifications for the job[,]" as its bid "lacked at least three of the job's minimum requirements: local business license, pesticide license, and DNLA certification." (D.I. 44 at 1, 3-5) Drawing all reasonable inferences in Plaintiff's favor, for the reasons discussed below, a reasonable jury could agree with Plaintiff and find that Defendants' arguments to the contrary are unworthy of credence.

#### (1) Local business license

The College's RFP for the 2010 Contract required each bidder to furnish with his bid "[p]roof of [b]usiness [l]icenses." (D.I. 46 at A113) And, as described above, while Outdoor's bid package included a Delaware Business License, it did not include a business license from the town of Georgetown. (D.I. 44 at 4; *see also* D.I. 46 at A372; D.I. 48, ex. D) With respect to this

48

missing component, Defendants assert the following:

> Bidders for the 2010 Contract did not have to submit a Town of
> Georgetown business license. As was explained by each of the
> Individual Defendants, the bidders were only required to produce
> "the State of Delaware business license[;]" in regards to the
> Georgetown license: "[i]f they obtained that, that was on them. If
> they did not, they were under the peril of the Town of Georgetown
> if they did not get that license." [citing D.I. 48, ex. C (Defendant
> Faucett's deposition) at 39] Faucett further testified: the [RFP]
> "did not require [submission of the Town of Georgetown business
> license]. The town required it." [citing *id.* at 41] Thus, it was not
> a component of the RFP.

(D.I. 47 at 1; *see also* Tr. at 71)

Defendants paint an inaccurate picture of the testimony in three respects. First, in support

of their statement that "each" of the Individual Defendants testified that bidders only had to

submit a State business license, Defendants provide but a single citation (to the deposition of

Defendant Faucett). If the other four committee members testified to such a fact, the Court is left

with no direction regarding the location of that testimony in the record. Second, and to the

contrary, at least one committee member, Defendant Serman, explicitly testified that bidders

were in fact required to submit proof of a Georgetown business license (along with a Delaware

State business license). (D.I. 44 at 4 (citing D.I. 46 at A461-62); *cf.* D.I. 46 at A362 (Defendant

Faucett confirming that the RFP stated that each bidder shall furnish proof of "business licenses,

plural")) And third, Defendant Faucett's testimony (to which Defendants cite above) relates

specifically to *Plaintiff's 2007 Contract*, not the 2010 Contract bidding process. (*See* D.I. 48, ex.

C at 38-41 (Defendant Faucett discussing the business licenses that Plaintiff was required to have

pursuant to his 2007 Contract))

In sum, there is evidence of record to indicate that bidders were required to submit a town

49

of Georgetown business license, and it is undisputed that Outdoor did not do so. Defendants' arguments and citations in support of the idea that no such license was required are both inapposite and inaccurate.

### (2)   Pesticide license

In response to Plaintiff's assertion that "Outdoor never proved it had the proper pesticide license[,]" (D.I. 44 at 4), Defendants state:

> From Outdoor's bid package: "Attached is a copy of pesticide license number for Ken Anderson. He currently is our turf manager in charge of all pesticide applications throughout the tri-state region." Outdoor had the required pesticide applicator's license.

(D.I. 47 at 1; *see also* Tr. at 71) However, Defendants ignore the RFP's requirement that the pesticide applicator's license be "*in the name of the business owner, principal or key officer.*" (D.I. 46 at A113 (emphasis added); *see also id.* at A362, A395, A483) Outdoor's bid package describes Anderson as a "turf manager"—not as a business owner, principal or officer. (D.I. 48, ex. D) Indeed, when asked whether Outdoor had submitted the required pesticide applicator's license, Defendant Schirmer testified that Outdoor "didn't prove it, to me" that it had done so. (D.I. 46 at A496) Accordingly, on this record, a factfinder could reasonably determine that Outdoor clearly failed to present the committee with the required pesticide license.

### (3)   DNLA certification or its equivalent

In response to Plaintiff's contention that Outdoor did not turn in proof of certification by the DNLA or equivalent certification, (D.I. 44 at 4), Defendants argue that:

> The RFP only required "proof of certification as a landscape professional by the [DNLA] or equivalent certification." Similar to Plaintiff, Outdoor provided proof of membership in Delaware

Ground[s] Management Association, which was an accepted
equivalent association.

(D.I. 47 at 1-2)

It is not disputed that at the time of the 2010 Contract decision, while Outdoor had

applied for DNLA certification, (D.I. 46 at A435), it had not received such certification.

Defendants' argument that Outdoor had provided sufficient proof of an "equivalent" certification

is based on two pieces of evidence: (1) Outdoor's submission of a receipt for a March 18, 2010

$50.00 check, paid to the Delaware Grounds Management Association for an "[a]ssociation

[f]ee"; and (2) testimony by Defendant Serman regarding the Delaware Grounds Management

Association. (D.I. 47 at 2 & n.13 (citing to D.I. 48, ex. E & ex. F at 46))[29] What is lacking here,

though, is any evidence indicating that paying an association fee to the Delaware Grounds

Management Association is the "equivalent" to obtaining "certification as a landscape

professional" from the DNLA. Indeed, what record evidence there is suggests that it was not.

On a DTCC bid proposal checklist regarding the Outdoor application, although every

other bid requirement was checked off, the requirement for "[p]roof of [p]rofessional

[l]andscaper [c]ertification" was unchecked. (D.I. 46 at A149)[30] And with regard to Defendant

Serman's testimony (again, the only testimony that Defendants point to in asserting that Outdoor

---

[29]     Although the name of the organization appears to be the "Delaware Grounds
Management Association[,]" (D.I. 48, ex. E), in Defendant Serman's deposition, he refers to the
organization as the "Delaware Grounds Maintenance Association[,]" (*id.*, ex. F at 46). It does
not appear disputed that Mr. Serman was in fact speaking about the "Delaware Grounds
Management Association" in the relevant portion of his deposition, and the Court will assume so
hereafter.

[30]     Instead, there is a handwritten question mark next to that entry, followed by the
handwritten phrase: "[c]opies of membership applications DE Nurserymen[.]" (D.I. 46 at A149)

met this requirement), Defendant Serman was asked "you didn't see proof of an [DNLA-] equivalent certification as a landscape professional [issued by] some other national or state trade group recognized within the industry from Outdoor [] in 2010; correct?" to which Defendant Serman responded, "[t]hat's correct." (*Id.* at A467-68) In view of this evidence, a reasonable jury could believe that Outdoor failed to submit sufficient proof of certification by DNLA or an equivalent certification.[31]

### (4) Conclusion

In sum, Plaintiff has presented sufficient evidence to "cast substantial doubt" on Defendants' assertion that they awarded the 2010 Contract to Outdoor over Plaintiff because, *inter alia*, Outdoor "submitted a far superior bid package . . . . *contain[ing] all necessary components*." A reasonable jury could simply disbelieve Defendants' reason, finding this explanation so plainly wrong that it is unworthy of credence.

### b. Outdoor bid a more competitive price

Another of Defendants' reasons for selecting Outdoor over Plaintiff is that Outdoor "offered a more competitive price." (D.I. 43 at 19) It is undisputed that Outdoor submitted the lowest bid of the three companies that were interviewed—Outdoor's bid was $65,750 per year, Plaintiff's bid was $68,868 per year and Priority's bid came in as the highest at $82,000 per year.

---

[31]    It is worth noting at this point, as Plaintiff does, (D.I. 44 at 4 n.14), that Defendant Hearn explained that his "understanding" of why DTCC made the switch from the open bidding process utilized for the 2007 Contract to the sealed bidding process for the 2010 Contract was because DTCC "wanted to have some professional certifications within the RFP," (D.I. 46 at A420). And yet, as to three of the licenses/certifications that DTCC ultimately required of bidders (i.e., the requisite proof of professional landscaper certification, the requisite proof of state pesticide applicator's license and the requisite proof of business licenses), a reasonable factfinder could conclude that the winning bidder (Outdoor) failed to provide sufficient proof of all three.

(D.I. 43, ex. C at 132; D.I. 46 at A364, A490-91) However, evidence proffered by Plaintiff regarding the pricing criterion is so contradictory that it casts real doubt on whether Defendants followed their own rules regarding implementation of the criterion. And that evidence (along with the other evidence referred to in Section III.B.3) in turn casts sufficient doubt on whether Defendants actually relied on this criterion at all as a reason why Outdoor was selected.

As an initial matter, the record contains contradictory evidence concerning whether the scoring criteria, as a whole, was intended to be subjective or objective. Defendants' briefing characterizes the scoring as the former. (*See* D.I. 43 at 8 (stating that "the Individual Defendants separately scored the contractors using *the subjective criterion* stated above" (emphasis added)); D.I. 47 at 5 & n.65 ("[T]he grading criteria was not objective. Each committee member testified that grading required use of their discretion and that countless factors may influence a bidder's score.") (citing solely to Defendant Schirmer's deposition)) Underscoring this, Defendant Hearn acknowledged that "I guess if you wanted to manipulate numbers [to allow DTCC to select the applicant that it wanted], you could[.]" (D.I. 46 at A426-27) Meanwhile, Dr. Smith testified that it was her understanding that the committee would score each applicant based on *objective* criteria. (D.I. 44 at 5 (citing D.I. 46 at A532) (Dr. Smith stating that "[a]ll [of DTCC's] processes are objective and according to guidelines"))

As Plaintiff sets out, (D.I. 44 at 6-7 & n.25), the inconsistency in whether scoring was supposed to be objective or subjective permeated the application of the pricing criterion. At least two committee members viewed this category as objective—in the sense that the lowest bidder should get the highest score. (D.I. 46 at A428 (Defendant Hearn), A431 (same), A465 (Defendant Serman)) Defendant Faucett, on the other hand, viewed the pricing criterion as

53

subjective—one in which an applicant was scored not simply on the amount of their bid, but on the quality DTCC would get for that bid amount. (*Id.* at A389-90) And Defendant Schirmer, for his part, did not even view the pricing criterion as the "most heavily weighted" of the five categories—even though it was explicitly described as such (worth 50% of an applicant's total score) in the *News Journal* advertisement. (*Id.* at A497; *see, e.g., id.* at A152.1) Even though Priority's bid was higher than Plaintiff's by over $13,000 *per year*, Defendant Schirmer gave Priority and Plaintiff the same score as to the pricing criterion, while Defendant Faucett gave Priority a *higher* score than Plaintiff on price. (*Id.* at A152.1, A152.2, A491)

All of this evidence could suggest to a reasonable fact finder that Defendants' application of the pricing criteria was internally inconsistent, even contradictory.[32] As such (and in light of the other evidence regarding pretext set out herein), a reasonable fact finder could disbelieve that Defendants had any uniform view that Outdoor's lower price bid was a reason that motivated the award of the 2010 Contract.

     **c.**    **Plaintiff demonstrated a pattern of bad or difficult behavior**

---

    [32]    Defendants' application of the "[g]eographical [l]ocation" criterion similarly suggests not only that (1) Defendants did not follow their own rules in the 2010 Contract application process; but (2) they failed to do so to such a degree that it casts doubt on the idea that Defendants uniformly relied on any one of these criterion in deciding that Outdoor should be awarded the 2010 Contract. (D.I. 44 at 6) All five committee members gave Outdoor scores of "4" for geographical location, a score that was supposed to reflect that an entity's "[m]ain office [was] in state [and that the entity also had a] location in Sussex County." (D.I. 46 at A153-57) And yet the undisputed evidence appears to be that: (1) Outdoor's bid proposal stated that Outdoor had two geographic office locations—one out-of-state in Maryland and another in Georgetown; and (2) when Defendants attempted to confirm this, they learned that Outdoor did not, in fact, yet have a permanent location in Georgetown. (*Id.* at A152, A365-69, A434, A494; D.I. 48, ex. G at 108) Under the objective scoring system listed on DTCC's Interview Form, this should have resulted in Outdoor receiving a "0" for "[g]eographical [l]ocation[,]" not a "4." (D.I. 46 at A153-57)

Another of the reasons Defendants cite for not awarding the 2010 Contract to Plaintiff is Plaintiff's behavior. Defendants contend that Plaintiff was: (1) "argumentative and confrontational;" (2) a "bully" and "abusive and loud" to the degree of causing a DTCC employee to break down and cry; and (3) argumentative when asked to pay for repairs to several windows that he broke. (D.I. 47 at 9-10 (internal quotation marks and citation omitted))

Drawing all reasonable inferences in Plaintiff's favor, he has cast substantial doubt on this reason by pointing out contradictory, inconsistent testimony from Defendants, as well as by citing testimony describing Plaintiff's behavior in a positive light. For example:

- In describing the myriad ways in which Plaintiff "struggled mightily" under the 2007 Contract, Defendants state that Defendant Booth described Plaintiff as "'confrontational and argumentative.'" (D.I. 43 at 5-6 & n.49 (quoting *id.*, ex. M at 97)) But as Plaintiff notes, Defendant Booth was unable to provide a single example of Plaintiff acting in this way, and went on to describe his own interactions with Plaintiff as "not aggressive and not real confrontational." (D.I. 44 at 8 n.30 (citing D.I. 46 at A406))

- Defendant Booth's testimony, in addition to being inconsistent in this regard, also appears to contradict Defendant Faucett's testimony. In explaining how Plaintiff had a "difficult personality" Defendant Faucett cited the fact that "[Defendant] 'Booth had a confrontation with [Plaintiff].'" (D.I. 43 at 6 (quoting *id.*, ex. C at 172)) Yet as noted above, Defendant Booth could not cite any example of such a confrontation in his testimony.

- In similar fashion, although Defendants rely on Dr. Smith's testimony, wherein she responded "yes" (without any elaboration) when asked if Plaintiff was ever argumentative and ever defensive, (D.I. 43 at 6 (citing *id.*, ex. L at 20)), Dr. Smith also stated "yes" when asked if Plaintiff was respectful and professional, (D.I. 44 at 8 (citing D.I. 46 at A524)).

- Defendants also highlight Defendant Faucett's testimony that "'[Defendant] Schirmer had problems with [Plaintiff]'" in depicting Plaintiff's allegedly difficult behavior. (D.I. 43 at 6 (quoting *id.*, ex.

C at 172)) However, Defendant Schirmer testified that he "never butted heads" with Plaintiff. (D.I. 44 at 8 (citing D.I. 46 at A476))

- Defendants further note that Defendant Faucett described Mr. Hastings as having "'problems with [Plaintiff,]'" (D.I. 43 at 6 (quoting *id.*, ex. C at 172)), but they have not pointed to evidence in the record from Mr. Hastings himself substantiating this claim.

Likewise, Defendants have not cited to additional evidence in the record, aside from Defendant Faucett's testimony, regarding the alleged incident in which Plaintiff was abusive and loud to two women. (D.I. 43 at 5 & n.27 (citing *id.*, ex. C at 166)) In light of the ways in which both Defendants Booth and Schirmer appeared to contradict Defendant Faucett's testimony regarding Plaintiff's behavior (set out above), a reasonable fact finder could conclude that Defendant Faucett's otherwise unsubstantiated statement deserves little weight.

The same could be said of Defendants' claim that Plaintiff "refus[ed] to take responsibility" for broken windows on Campus. (D.I. 47 at 3; *see also id.* at 10) Defendant Faucett's testimony is all that there is in the record regarding this claim. (*See id.* at 3 (quoting D.I. 48, ex. C at 163-64)) Defendants do include in the record a June 2007 letter from Defendant Faucett to Plaintiff regarding broken windows; this letter, however, does not provide any hint that Plaintiff refused to accept responsibility for or make payment regarding the windows. (D.I. 43, Ex. O)[33]

---

[33] Defendants also assert, as one of their 23 reasons for awarding the 2010 Contract to Outdoor, that "Plaintiff refused to remove leaves when asked," (D.I. 47 at 9), a reason that could arguably also fall into the "difficult behavior" category. Defendants reiterate this allegation at least two additional times. (*Id.* at 3 (stating that "Plaintiff . . . consistently resisted all instruction" with respect to leaf removal); *see also* D.I. 43 at 6 (asserting that according to Defendant Schirmer, "Plaintiff refused to remove leaves")) However, as Plaintiff sets out, (D.I. 44 at 10 (citing D.I. 46 at A479)), it is reasonable to infer that this allegation is contradicted by the evidence. To support the allegation, Defendants cite to one page of Defendant Schirmer's testimony in which he explained that when the Campus experienced a big wind or storm, "a

Accordingly, nearly all that exists in the record regarding Plaintiff's allegedly "argumentative, combative, and difficult" behavior, (D.I. 43 at 19), is testimony from Defendant Faucett—testimony that is clearly contradicted in at least some respects by other individuals. In light of this, and giving Plaintiff the benefit of all reasonable inferences, a reasonable factfinder could rationally find this explanation unworthy of credence.

### d. Plaintiff demonstrated poor performance and an inability to maintain the Campus as a "showplace"

Plaintiff's ability to sufficiently cast doubt on the above three non-discriminatory reasons referenced above might amount to casting substantial doubt on a "fair number of" Defendants' "bagful" of proffered rationales for their bidding decision. However, the Court will also examine a fourth explanation for Defendants' decision: that Outdoor was awarded the 2010 Contract because Plaintiff's performance under the 2007 Contract was poor. This appears to be the central category of reasons that Defendants rely upon for their decision, as a majority of Defendants' "23 reasons" fall into this bucket. (D.I. 47 at 9-10) And there is some suggestion in the case law that where a plaintiff calls into question some of a defendant's "bagful" of reasons, but not the "primary explanations" which would themselves be adequate grounds for the unfavorable action, then the plaintiff cannot succeed in making out a case of discrimination under *Fuentes*. *See Anderson v. Equitable Res., Inc.*, Civil Action No. 08-952, 2009 WL 4730230, at *11 (W.D. Pa.

whole lot of stuff comes down at once. . . . you need to get in right away to pick [leaves] up because if you don't, they go right to the drains[.]" (D.I. 43 at 6 (citing *id.*, ex. J at 26)) Defendant Schirmer asked Plaintiff to remove these leaves, and "if [he was] not mistaken, [Plaintiff] said that it's not his problem that the drains are clogged[,]" to which Defendant Schirmer replied, "'if you take care of the leaves, then everybody is good.'" (*Id.*, ex. J at 26) Moments later (two deposition pages later), Defendant Schirmer stated "[t]he leaf removal [Plaintiff] did take care of." (*Id.* at 28)

Dec. 4, 2009); *Carrier v. City of Plainfield*, Civil Action No. 07-2739 (SRC), 2009 WL 3681896, at *3, *6 (D.N.J. Nov. 4, 2009) (explaining that where the defendant presented a bagful of reasons for promoting another employee over the plaintiff, the plaintiff "may not need to cast doubt on every one of [the] [d]efendant's proffered reasons" but "must, however, cast doubt on the core facts that the employer has put forward as the legitimate reason"); *cf. Tomasso v. Boeing Co.*, 445 F.3d 702, 707-11 (3d Cir. 2006) (conducting the "bagful" of reasons analysis and concluding that the plaintiff "has cast sufficient doubt on [the defendant's] *primary explanations* for his layoff under *Fuentes*") (emphasis added).

To be sure, certain Individual Defendants offered various criticisms of Plaintiff's performance during their depositions. (D.I. 43 at 5-7; D.I. 47 at 2-4, 9-10; *see also supra* p. 6-9) Additionally, there exists at least some documentary evidence (mainly from the early part of the contract term) suggesting specific deficiencies: (1) the November 2007 e-mail from a DTCC visitor reporting that his vehicle was covered in grass, (D.I. 43, ex. Q); (2) Defendant Faucett's April 2007 meeting notes (recorded approximately three months after Plaintiff began work) in which he wrote that there were "still" many weeds that needed tending to and that mulching was incomplete, (*id.*, ex. R); and (3) the May 2007 work orders noting that weeds and long grass existed on a particular area of the campus (although one order also reported being "thrilled with the work so far"), (*id.*, ex. P).[34]

However, and though the issue is close, the Court finds that if Plaintiff is given the

---

[34]     There are also Defendant Schirmer's photographs depicting various landscaping issues, although it is less than clear when exactly he took them (and even his purported explanation of *why* he took them, cited by Defendants, is missing from the record). *See supra* p. 7-8 & n.9.

benefit of all reasonable inferences, he has sufficiently cast doubt on this explanation. The Court comes to this conclusion for several reasons.

At the outset, it is compelling that the 2007 Contract contained a provision granting DTCC the unilateral right to terminate Plaintiff's contract at any time if landscaping services were not performed to DTCC's satisfaction. (D.I. 44 at 11 n.42 (citing D.I. 46 at A360.1, A480.1)) Indeed, the notion that DTCC would terminate Plaintiff's contract if it was unhappy with his performance was further conveyed to Plaintiff on at least two other documented occasions. (*See* D.I. 43, ex. A (Defendant Faucett's December 2006 letter to Plaintiff advising that "I want this College to reflect a showplace *and will accept nothing less*" (emphasis added); *id.*, ex. R (Defendant Faucett, in his comments regarding an April 2007 meeting with Plaintiff, records that Plaintiff should "do[] the best he can to produce a showplace" and "[*n*]*o excuses* will be acceptable as to non-performance of this contract on Miller's behalf." (emphasis in original))) Yet Plaintiff was retained for the entire term of the 2007 Contract. (D.I. 44 at 11 n.42 (citing D.I. 46 at A415.1, A528.1); *see also* D.I. 46 at A360.1) Of course, there could be reasons why DTCC, though unhappy with Plaintiff's performance, let him finish the 2007 Contract term. But, on the other hand, a factfinder could view Defendants' explanation that Plaintiff demonstrated "substandard" performance under the 2007 Contract with some suspicion. If that was the case, it might ask, then why did DTCC not do what it repeatedly said it would do in such a scenario—and, indeed what it did do with respect to another landscaping company, Trugreen, (*see* D.I. 44 at 8 n.33 (citing D.I. 46 at A386))—accept nothing less than a showplace, and terminate the contract?

Next, although Defendants assert that their decision was based in part on the fact that

59

"Plaintiff was . . . unable to maintain [a] 'showplace' effect[,]" (D.I. 43 at 7), Defendant Faucett testified that *no* landscaper has been unable to "get [the campus] looking like a showplace[,]" (D.I. 44 at 11 (citing D.I. 46 at A391-93)). Although Outdoor did not produce a showplace-quality effect, for example, Defendant Faucett wished to renew Outdoor's Contract as of the time period very near the end of that contract term. (D.I. 46 at A379, A392-93)[35] A reasonable factfinder could view this reason as demonstrating inconsistency in Defendants' explanation for not selecting Plaintiff. *Cf. Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 320 (3d Cir. 2000) (where the plaintiff argued that "other employees with poor scores for administrative and organizational ability were nevertheless awarded the 'preferable' positions purportedly denied her because of those weaknesses[,]" explaining that "[t]hat allegation, if proven, would support a finding of discrimination").

Moreover, there are a number of pieces of evidence depicting Plaintiff's performance under the 2007 Contract in a positive light: (1) Defendant Schirmer testified that Plaintiff did a "great job" cutting grass; (2) former Dean Johnson told Plaintiff he did a "'good job'" under the contract; (3) Defendant Hearn personally witnessed no issues with Plaintiff's performance; (4) Defendant Serman made no complaints about Plaintiff's work; (5) Defendant Booth assumed the Campus was ready for the Gala for all three years during the 2007 Contract; and (5) Dr. Smith told Plaintiff that the "grounds look great" at or before a Gala. (D.I. 44 at 8 & n.32-33 (citations

---

[35]     In their reply brief, Defendants attempt to cast Plaintiff's allegation that "Faucett sought to renew Outdoor" as an "inaccurac[y,]" since the record shows that "Faucett did not offer to renew Outdoor." (D.I. 47 at 1, 3) However, the record clearly demonstrates that as of September 2012, Defendant Faucett "wished to renew Outdoor's contract." (D.I. 44 at 11 n.41 (citing D.I. 46 at A309, A379)) The record also shows that Outdoor was not retained at least in significant part because Outdoor stopped showing up to the Campus a few months before its contract was scheduled to end. (D.I. 46 at A378.2-80)

omitted))

Finally, with respect to at least some of the criticisms set out by Defendants—such as Defendant Faucett's accusation that Plaintiff harmed trees with weed killer, or Defendant Schrimer's complaint that Plaintiff improperly cut ornamental grasses—there is some conflict in the testimonial evidence. Defendants suggest that they believed that these problems existed, but Plaintiff attempts to contradict that evidence, asserting that he knew what he was doing and his actions were appropriate. (*Id.* at 10 (citations omitted))

The Court finds that, viewing the current evidence in a light most favorable to Plaintiff, there remains a genuine issue of material fact regarding whether Plaintiff's performance under the 2007 Contract was deficient to such a degree that it motivated Defendants to award the 2010 Contract to Outdoor. In light of the evidence set out above, it is possible that a factfinder could credit Defendants' explanation. On the other hand, a reasonable factfinder, considering all of the evidence, could find Defendants' explanation to be a sufficiently weak one that is "unworthy of credence."

### e. Conclusion

By establishing that four of the five categories of explanations provided by Defendants are reasonably disbelievable, Plaintiff has succeeded in casting doubt on a "fair number" of Defendants' "bagful" of legitimate reasons for not awarding Plaintiff the 2010 Contract. *See Fuentes*, 32 F.3d at 763. Accordingly, the Court concludes that a reasonable factfinder could be justified in finding that Defendants' credibility is undermined to such a degree that it casts doubt on Defendants' true motivation for awarding the contract to Outdoor. The Court hastens to add that its conclusion here is in no way meant to suggest that Defendants are indeed guilty of

discrimination, or that Plaintiff will ultimately be able to prevail on his claims. Rather, Plaintiff has demonstrated that genuine issues of material fact exist, that they preclude summary judgment, and that the case should move on to the trial stage.[36]

## IV. CONCLUSION

For the reasons set forth above, the Court recommends that Defendants' Motion be DENIED.[37]

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: July 1, 2015

*Christopher J. Burke*

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

[36] Because Plaintiff presented sufficient evidence under prong one of the *Fuentes* test to discredit Defendants' "bagful" of reasons for awarding the 2010 Contract to Outdoor instead of to him, the Court need not address Plaintiff's secondary arguments with respect to the second prong, (D.I. 44 at 11-13). *Cf. Horner v. Allegheny Gen. Hosp.*, Civil Action No. 07-1634, 2010 WL 724452, at *16 (W.D. Pa. Mar. 1, 2010).

[37] The Court recommends that Defendants' request for costs under 42 U.S.C. § 1988, (D.I. 47 at 10; Tr. at 7), also be DENIED.